**Paul LESSIG, Appellant,**

v.

**TIDEWATER OIL COMPANY, Appellee.**

**No. 17924.**

United States Court of Appeals Ninth Circuit.

Jan. 2, 1964.

Rehearing Denied Feb. 17, 1964.

462

Maxwell Keith, San Francisco, Cal., for appellant.

Brobeck, Phleger & Harrison, Moses Lasky and Richard Haas, San Francisco, Cal., for appellee.

Before MADDEN, Judge of the Court of Claims, and HAMLEY and BROWNING, Circuit Judges.

BROWNING, Circuit Judge:

This is an appeal by Paul Lessig from a judgment entered on a jury verdict in a suit for damages brought by Lessig under Section 4 of the Clayton Act,[1] alleg-

---

1. 38 Stat. 731 (1914), 15 U.S.C.A. § 15: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

ing injury from violations by Tidewater Oil Company of Sections 1 and 2 of the Sherman Act [2] and Section 3 of the Clayton Act.[3] We conclude that reversible error occurred in instructing the jury, and remand for new trial.

Tidewater entered into a service station lease and dealer contract with Lessig November 15, 1955, and cancelled both May 15, 1958. The theory of Lessig's case was that during this period Tidewater violated the antitrust laws (1) by fixing the prices at which its dealers resold gasoline, and (2) by imposing upon its dealers a system of exclusive dealing and tying arrangements in the purchase of petroleum products, tires, batteries, and those automotive accessories which were sold or sponsored by Tidewater, and that Lessig was injured thereby.

## I

*Resale Price Maintenance*

A. *Sufficiency of evidence of violation*

Lessig offered evidence of the following circumstances in support of his allegation that Tidewater conspired, or created a combination, to control the price at which its dealers resold gasoline.[4]

Tidewater required its dealers to purchase their estimated total requirements of gasoline from Tidewater at prices "posted by seller at the time and place of delivery." It steadily increased the wholesale or tank-wagon price charged dealers during the relevant period, though the retail price dropped on several occasions. When the retail price went down, Tidewater extended "dealer-aid" in the form of a rebate from the tank-wagon price. When retail prices went up, the rebate was diminished or withdrawn. Payment of "dealer-aid" was conditioned upon adherence by the dealer to resale prices stipulated by Tidewater.

By maintaining, or increasing, the wholesale price when the retail price declined, Tidewater brought pressure upon dealers to accept "dealer-aid" and the accompanying condition requiring resale price maintenance. In addition, Tidewater's representatives checked the prices at which dealers sold their gasoline, told dealers the price changes they were to make, changed prices posted on their pumps, placed price signs on the station premises reflecting the new price, and threatened to terminate and terminated dealers' leases and contracts if dealers did not comply with suggested price changes. Lessig was given notice of termination of his lease and contract three days after he refused to reduce his resale price when Tidewater's district sales manager told him it was two cents too high.

From this evidence the jury could conclude that Tidewater entered into agreements with its dealers fixing

---

2. 26 Stat. 209 (1890), 15 U.S.C.A. § 1:

 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. * * *

 26 Stat. 209 (1890), 15 U.S.C.A. § 2:

 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

3. 38 Stat. 731 (1914), 15 U.S.C.A. § 14:

 "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

4. Throughout the opinion the evidence and inferences to be drawn from it are stated as favorably to Lessig as the record permits. Conflicts in the evidence (and they are substantial) are resolved in Lessig's favor.

resale prices, thus contracting and conspiring in violation of Section 1 of the Sherman Act, or, alternatively, that Tidewater secured dealer adherence to resale prices by a coercive scheme not limited to refusals to deal announced in advance, thus creating a combination in violation of Section 1.[5]

### B. *Sufficiency of evidence of damage*

The evidence supporting Lessig's claim of injury prior to the termination of his lease and contract from Tidewater's resale price-fixing activities was not strong. However, the jury could readily infer that Tidewater terminated its business relationship with Lessig because he failed to adhere to the resale price-fixing scheme. Cancellation of Lessig's lease and dealer contract in such circumstances would be unlawful, though in exercise of a right expressly granted Tidewater by the lease and contract[6] Lessig could claim compensation for the resulting loss, including reasonably anticipated future profits,[7] and there was evidence from which the jury could find that such loss occurred.

### C. *Alleged error in instructions*

Tidewater makes the threshold contention that review of many of Lessig's numerous claims of error is barred by Lessig's failure properly to present his

5. United States v. Parke, Davis & Co., 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed. 2d 505 (1960) ("In other words, an unlawful combination is not just such as arises from a price maintenance *agreement*, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy."); Osborn v. Sinclair Ref. Co., 324 F.2d 566 (4th Cir. 1963). Parke, Davis and the decisions which preceded it are exhaustively analyzed by Dean Levi v. The Parke-Davis-Colgate Doctrine: The Ban on Resale Price Maintenance, The Supreme Court Review 258-326 (1960). See also Halper, Individual Refusals to Deal: Customer Selection or Dealer Protection, 22 A.B.A. Antitrust Section 49 (1962).

In Sun Oil Co. v. F. T. C., 294 F.2d 465, 482-484 (5th Cir. 1961), the Court of Appeals reversed a finding of a price-fixing agreement based in part upon the granting by Sun of an allowance on the wholesale price to enable a dealer to lower his retail price to meet competition. Unlike the present case, the dealer testimony was that there was no express or tacit agreement as to the resale price. FTC did not seek review of this portion of the Court of Appeals decision. F. T. C. v. Sun Oil Co., 371 U.S. 505, 511, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). However, the Supreme Court noted, in another connection, "to the extent that * * * the supplier attempted to set, or was responsible for setting, the retail price, there would be inherent antitrust problems arising from possible existence of illegal price-fixing agreements." 371 U.S. at 524 n. 14, 83 S.Ct. at 369, 9 L.Ed. 2d 466.

6. Poller v. Columbia Broadcasting Co., 368 U.S. 464, 468-469, 82 S.Ct. 486, 7 L. Ed.2d 458 (1962); Osborn v. Sinclair Ref. Co., 324 F.2d 566, 575 n. 17 (4th Cir. 1963). See also Englander Motors, Inc. v. Ford Motor Co., 267 F.2d 11, 15 (6th Cir. 1959).

7. See, e. g., Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 595 (10th Cir. 1961); A. C. Becken Co. v. Gemex Corp., 272 F.2d 1, 4-5 (7th Cir. 1959); Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846, 854 (8th Cir. 1952); Timberlake, The Legal Injury Requirements and Proof of Damages in Treble Damage Actions under the Antitrust Laws, 30 Geo.Wash. L.Rev. 231, 277-83 (1961-1962).

Whatever relevance Simpson v. Union Oil Co., 311 F.2d 764 (9th Cir. 1963), cert. granted April 29, 1963, 373 U.S. 901, 83 S.Ct. 1290, 10 L.Ed.2d 197, may have to Lessig's claim of damage from Tidewater's resale price-fixing activities during his occupancy of the station, it has no bearing upon his claim for loss of future profits because of cancellation of the lease and contract.

The problem of establishing proximate cause said by some to arise when the damage claim is based upon an alleged refusal to deal prohibited by § 3 of the Clayton Act (see note 38) does not exist when, as in the present case, the refusal to deal is part of a course of conduct violative of § 1 of the Sherman Act. A. C. Becken Co. v. Gemex Corp., 272 F.2d 1 (7th Cir. 1959); Halper, Individual Refusals to Deal: Customer Selection or Dealer Protection, 22 A.B.A. Antitrust Section 49, 59 (1963).

objections at trial. This may be true of some specifications, but that we need not decide. Lessig did properly present and preserve an objection to what we believe was reversible error in instructing the jury as to damages.

■■ Lessig tendered to the court a proposed instruction concerning his right to recover reasonably anticipated future profits lost as a result of the cancellation of his lease and contract.[8] The instruction was not given, and Lessig made timely objection. The omission was error.[9] The error was prejudicial since the jury was instructed in detail as to Lessig's right to recover profits lost during his occupancy of the station, and therefore might have concluded that he could recover only on this theory.[10] Such a misconception could have led to the verdict adverse to Lessig, for while Lessig's proof of causal connection between the alleged violation and the lease cancellation was substantial and direct, his proof of loss of profits from Tidewater's conduct during his occupancy of the station was, as we have said, relatively meager and tenuous.

Reversal is thus required,[11] and we consider only those remaining assignments of error pertinent to a new trial and ignore Lessig's failure to comply with Rule 51 of the Federal Rules of Civil Procedure and other procedural obstacles which would ordinarily preclude review of some of the matters discussed.

■ Lessig argues that the trial court should have instructed the jury that Tidewater's conduct relating to resale price maintenance violated the Sherman Act as a matter of law. The instruction was properly refused. Tidewater did not concede that "dealer-aid" was conditioned on dealer adherence to its stipulated resale prices. Its officials testified that "dealer-aid" was given whenever the prevailing retail price in a particular area fell below the level at which Tidewater's dealers could pay the posted wholesale price and retain a fair margin of profit; and they insisted that each dealer, though receiving the rebate, was nonetheless free to meet the prevailing retail price or not as he saw fit. The jury was entitled to accept this explanation, and reject the contrary evidence.[12]

8. The instruction requested read:
"A plaintiff whose lease and product agreements have been cancelled as a result of conduct in violation of the antitrust laws is entitled to be awarded as damages the loss of profits and values resulting from the cancellations.
"If you find that Paul Lessig had developed net income and profits at the service station at 22nd and Irving Street, San Francisco during the period May, 1955, to May 15, 1958, and there was reasonable likelihood that such net earnings and profits would have continued in the future you may award as damages the value of such future profits as of the date of cancellation." Lessig also objected to the omission of three other instructions on damages. One was simply a generalized restatement of the instruction quoted; two were sufficiently covered by instructions which were given.

9. See note 7.

10. Tidewater argues that the omission of the requested instruction was unimportant since the jury was given general instructions that "the purpose of the

law of damages is to place a party in as good a position as he would have enjoyed but for the wrong done," and the calculation "should include all damages suffered by the plaintiff because of lost profits"; and because the jury was told that it might base its award on the testimony of the expert witnesses, which related in part to loss suffered as a result of the cancellation. But these generalizations and possible inferences were not the fair equivalent of the specific instruction to which Lessig was entitled.

11. Cf. Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 30, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962).

12. Similarly, Tidewater did not concede that, as a condition to "dealer-aid," it required its dealers to post signs showing a specified retail price. Tidewater officials testified that price signs were furnished to dealers only as a convenience to assist them in complying with California law governing the size, content, form, and color of gasoline price signs (see note 15), and that they were given whatever numbers they wished to post.

We agree with Lessig, however, that the instructions given did not adequately inform the jury of the theory underlying the price-fixing aspect of his case. They did not clearly state in terms of the specific facts of the case:[13] (1) that Lessig need not prove an express agreement to maintain resale prices, but was entitled to prevail, assuming injury, if he established tacit agreements by circumstantial evidence; and (2) that Tidewater could not lawfully go beyond refusals to deal, announced in advance, to secure adherence to resale prices, and Lessig was entitled to prevail, assuming injury, if he established that Tidewater exceeded this limitation in the respects indicated by Lessig's evidence, outlined above.

The instructions on this phase of the case were objectionable in another respect. Lessig testified in detail regarding a conversation with Tidewater's district sales manager immediately preceding receipt by Lessig of notice of the cancellation of his lease and contract. With apparent reference to this conversation, the court instructed the jury "that it was not unlawful for Tidewater to tell Mr. Lessig that his retail prices were so high that a loss of sales and customers was likely." This was one of several instructions which isolated particular incidents from the total course of Tidewater's conduct and pronounced each lawful. These instructions were no doubt accurate, so far as they went. However, as the Supreme Court recently stated, "[i]n cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. ' * * * [T]he character and effect of a conspiracy [or combination] are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. * * * ' "; and "acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 707, 82 S.Ct. 1404, 1410, 1415, 8 L.Ed.2d 777 (1962).[14]

We have said that it would be reversible error to instruct the jury that particular acts, alleged to be part of a conspiracy, were lawful, without adding the express qualification, "in the absence of conspiracy" (Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp., 264 F.2d 602, 606 (9th Cir. 1958)), and it is at least clear that an instruction that a component element of an allegedly illegal course of conduct is lawful should be accompanied by a substance of the admonitions which we have quoted from Continental Ore Co.[15]

13. Although instructions need not be framed in terms of the specific facts in all cases (Cohen v. Western Hotels, Inc., 276 F.2d 26, 28 (9th Cir. 1960); cf. Baker v. United States, 310 F.2d 924, 930 (9th Cir. 1962)), it would seem appropriate to do so where, as here, the abstract legal principles are not self-explanatory to a lay jury, and the facts to which they must be applied are complex. Cf. 2B Barron & Holtzoff, Federal Practice & Procedure 469–70 (1961).

14. Quoting United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333 (1913). See also Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9th Cir. 1963).

15. Some of the instructions given by the trial court to which this comment will apply, if they are repeated at the new trial, are the following: that it was lawful for Tidewater to sell gasoline to its dealers at any price it thought proper; that Tidewater was under no legal obligation to enable its dealers to make a large, small, or any, profit; and that it was lawful for Tidewater to reduce its price to its dealers whenever it thought necessary or advisable.

A somewhat related problem is raised by the reading to the jury of the full text of Cal.Bus. & Prof.Code, §§ 20880, 20882, 20882.5, 20883, 20887, and 20888, pertaining to the display by service stations of signs showing retail gasoline prices. It seems to us that an epitomization of the statutory provisions with an explanation of their limited relevance to the issues would be better calculated to clarify the issues in the minds of the jurors.

### D. Alleged error in exclusion of evidence

No substantial error occurred in the exclusion of evidence relating to resale price maintenance. Most of the excluded material was cumulative or only remotely relevant, and the discretion of the trial court in dealing with it was accordingly broad.

## II

### Exclusive Dealing and Tying Arrangements

### A. Sufficiency of evidence of violation

Lessig offered evidence of the following circumstances in support of his allegation that Tidewater imposed upon its dealers a system of exclusive dealing and tying arrangements applicable to petroleum products, and to tires, batteries, and automotive accessories (TBA) which Tidewater sold or sponsored.[16]

Tidewater's service station leases were renewable annually, and were subject to cancellation at six-month intervals on thirty days' notice. Each dealer contract ended automatically upon termination of that dealer's lease. The dealer was required by his contract to purchase from Tidewater "his total requirements of gasoline, motor oils and greases, regularly manufactured and sold by" Tidewater, to an amount specified in the contract; and the amount specified in each dealer contract was the estimated full requirements of that dealer's station. When the service station lease and dealer contract were executed Tidewater's representatives told the dealer that he was to purchase from Tidewater his requirements of petroleum products and of those TBA items which it sponsored or sold. Tidewater's representatives accompanied salesmen of sponsored merchandise while the latter secured orders from dealers.

Tidewater's representatives inspected dealers' stations for competing merchandise, required that it be returned, and threatened nonrenewal of the offending dealer's lease. Credit card sales of non-sponsored merchandise were charged back to the dealer if the customer failed to pay. New dealers were required to purchase from outgoing dealers only inventory purchased from Tidewater.

The record disclosed the disproportionate size and economic strength of the parties.[17] There was evidence that Tidewater imposed exclusive dealing and tying arrangements against the dealers' wishes to provide Tidewater with non-competitive access to the portion of the market which the dealers' stations represented. Dealers testified that they feared to buy competing brands of oil and sponsored TBA items even when requested by customers and even though the cost to dealers was less, and that when they purchased competing merchandise they hid it.

Evidence was offered that Tidewater entered into leases and dealer contracts, containing provisions similar to those described, with about 2,700 service station operators in eight western states. Some of the practices described admittedly were followed with respect to all Tidewater dealers, and the others appeared to be of quite general application. Thus, the jury could conclude that the restrictive provisions and practices affected a substantial portion of Tidewater's sales to its dealers of about 310 million gallons of gasoline annually (about five per cent of the gasoline sold through dealers in the area), and four to five million dollars worth of TBA.

From this evidence the jury could conclude that Tidewater sold petroleum products and sponsored TBA to its deal-

---

16. Tidewater produced the gasoline and other petroleum products which it sold to dealers for resale. It purchased tires and batteries and resold them to dealers. It also distributed selected automotive accessories under agreements with manufacturers providing that Tidewater was to [text cut off]

have a stipulated discount or rebate on sales to dealers.

17. Tidewater is one of the country's major oil companies. It does business in 32 states, and its assets exceed $800 million. It sold about 6.5% of the total gasoline sold in the eight western states.

ers upon conditions and understandings —express and tacit, oral and written— that they not deal in commodities sold by competitors of Tidewater. The only serious question is whether the jury could also conclude that these conditions and understandings might lessen competition substantially or tend to create a monopoly in a line of commerce, as required by the Clayton Act.

We think Standard [18] and Richfield Oil [19] require a holding that the jury could so conclude from such relevant factors, common to those cases and this, as the following: the limited number of desirable station sites and the substantial investment required to acquire and develop them; the large number of stations to which competitive access was denied; the large volume of gasoline and TBA retailed by those stations, and the substantial share which these sales represented of total sales of gasoline in the western states; the fact that the restrictive condition was imposed not only upon the sale of Tidewater's own petroleum products, but also upon the sale of TBA produced and sold by others; the marked disparity in the bargaining power of the parties; and evidence that the restrictive condition was imposed for the very purpose of eliminating competition for dealer patronage.

As Tidewater points out, the percentage of service stations in the market

affected by its conduct was not established in the present case, as it was in Standard. However, the percentage of sales of gasoline in the area made through Tidewater stations was shown (about 5 per cent as compared with 6.7 per cent in Standard), and would seem to reflect the impact of the restrictive arrangements more accurately than would the percentage of retail outlets affected.[20]

Tidewater also points out that the record did not disclose total sales in the western states of any of the TBA items involved, and hence the share sold through its stations could not be determined. In Standard such information was available as to some TBA items. However, knowledge of the share of the market foreclosed is not invariably required to determine whether exclusive dealing arrangements violate Section 3 of the Clayton Act. The test remains whether the jury can find from all the circumstances that the effect of the particular arrangements "may be to substantially lessen competition or tend to create a monopoly in any line of commerce[11]; and, as the Clayton Act tying clause cases demonstrate, this may appear from facts other than the proportion of total commerce in the relevant market which is subject to restraint.[21]

In Standard the proportion of total sales of automotive accessories affected was not shown, and the evidence

---

[18] Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

[19] Richfield Oil Corp. v. United States, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1344 (1952), affirming per curiam Judge Yankwich's decision at 99 F.Supp. 280 (S.D. Cal.1951).

[20] Compare United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), with Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328–329, 81 S.Ct. 623. 5 L.Ed. 2d 580 (1961).

[21] See, e. g., International Salt Co. v. United States, 332 U.S. 392, 396, 68 S. Ct. 12, 92 L.Ed. 20 (1947) (tied product salt; sales affected $500,000; total sales

not disclosed); Northern Pac. Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (tied product transportation; neither amount affected nor the total disclosed); Osborn v. Sinclair Ref. Co., 286 F.2d 832, 835 (4th Cir.1960) (tied product TBA; volume affected was "not insubstantial"; total sales not disclosed; Sinclair sold 10% of the gasoline sold in Maryland, and dealt with 10% of the stations in that state). See also Brown Shoe Co. v. United States, 370 U.S. 294, 329–331, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); cf. Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328–329, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), exhaustively analyzed in Bok, The Tampa Electric Case and the Problem of Exclusive Arrangements under the Clayton Act, The Supreme Court Review 267 (1961), and in

was that Standard's sales of tires and batteries "have never, as to either of these products, exceeded 2% of the total sales in the Western area" (337 U.S. at 296–297, 69 S.Ct. at 1053–1054, 93 L.Ed. 1371). Clearly, the Court's conclusion that competition might be lessened substantially did not rest upon the proportion foreclosed of total commerce in these products. The probable basis for the Court's conclusion, equally applicable to the present case, was that dependence upon Standard for petroleum supplies and station leases so restricted dealer freedom of choice that arrangements requiring dealers to purchase TBA from Standard, in their anti-competitive effect, "should perhaps," as Justice Frankfurter said, "be considered, as a matter of classification, tying rather than requirements agreements." 337 U.S. at 305 n. 8, 69 S.Ct. at 1058, 93 L.Ed. 1371.[22]

We are also satisfied that other grounds of distinction suggested by Tidewater between this case and Standard do not justify a different result.[23]

As an independent theory of violation, applicable to TBA, Lessig contended that Tidewater leased its service stations and sold its petroleum products on the condition that its dealers purchase the TBA which it sponsored or sold.

Of course, if a substantial volume of TBA were involved, or if Tidewater possessed coercive economic power over its dealers because of its role as a lessor of service stations and distributor of petroleum products, such tying arrangements would violate Section 3 of the Clayton Act; they would violate Section 1 of the Sherman Act as well if both of these conditions were present.[24] The quantum of power over the tying product prerequisite to Sherman Act violation is simply "sufficient economic power to impose an appreciable restraint on free competition in the tied product * * *."

Smith, Vertical Arrangements in Antitrust Law: Exclusive Dealing Arrangements, 22 A.B.A. Antitrust Section 19 (1963).

22. As the Court pointed out in Brown Shoe Co. v. United States, 370 U.S. 294, 330, 82 S.Ct. 1502, 1526–1527, 8 L.Ed. 2d 510 (1962), the usual tying contract is "inherently anticompetitive" because it "forces the customer to take a product or brand he does not necessarily want," whereas requirements contracts "are frequently negotiated at the behest of the customer who has chosen the particular supplier and his product upon the basis of competitive merit." Evidence in the present case that exclusive dealing was imposed against the dealers' will, and that if free to choose dealers would have bought competitive products, lends support to the conclusion that these arrangements were substantially anticompetitive in effect, unlike requirements contracts which the buyer is free to accept or reject.

Moreover, in evaluating the impact on competition, exclusive dealing arrangements imposed in a context of coercion should be treated as indefinite in duration. Bok, The Tampa Electric Case and the Problem of Exclusive Arrangements under the Clayton Act, The Supreme Court Review 267, 313–14 n. 119 (1961).

23. The number of stations and volume of trade affected were somewhat greater in Standard than in the present case, and there was an explicit showing in Standard, but not in this case, that other major oil companies in the market were also operating under exclusive dealing arrangements. However, judging from the district court opinion in Richfield, these factual disparities, as well as those previously mentioned, likewise existed between that case and Standard, and the Supreme Court affirmed Richfield on the ground that the issues raised were "substantially the same as those decided in Standard * * *." 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1344 (1952).

24. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 608–609, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The applicability of the Sherman Act must be considered because § 3 of the Clayton Act applies only to the lease or sale "of goods, wares, merchandise, machinery, * * * or other commodities," and therefore would not be violated if the jury concluded that Tidewater tied TBA only to the leasing of service stations, and not to the sale of petroleum products. See Northern Pac. Ry. v. United States, 356 U.S. 1, 13 n. 1 (1958).

Northern Pac. Ry. v. United States, 356 U.S. 1, 11, 78 S.Ct. 514, 521, 2 L.Ed.2d 545 (1958).[25] This power "may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." United States v. Loew's Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962). For this reason, and because power to monopolize need not be demonstrated, it is "seldom * * * necessary in a tie-in sale case to embark upon a full-scale factual inquiry into the scope of the relevant market for the tying product and into the corollary problem of the seller's percentage share in that market." 371 U.S. at 45 n. 4, 83 S.Ct. at 102, 9 L.Ed.2d 11. Indeed, the requisite control of the tying product may be inferred from the seller's success in imposing a tying condition upon a substantial amount of commerce in the tied product, at least in the absence of some other explanation for the existence of the restraints.[26]

In the present case there was evidence from which the jury could infer that the alleged tying arrangements were imposed as a matter of general practice, and therefore affected the substantial volume of TBA sold by Tidewater's dealers. The jury could also find that Tidewater possessed the economic power requisite to Sherman Act violation from the fact that it successfully imposed tying conditions upon a substantial volume of TBA sales, and from the following circumstances. Tidewater could cancel dealer contracts on short notice, and decline to renew them upon expiration. The consequences of termination were disproportionately grave to the dealer. Tidewater could substitute one dealer for another readily, or operate the station for itself. The dealer was economically bound to his station and to Tidewater's petroleum products; they were to him unique. The good will of his business attached to them; moreover, he was bound by contract to purchase his requirements of petroleum products from Tidewater; and even if he were free to shift, a change would involve substantial expense,[27] and the dealer's economic resources were usually limited.

We are satisfied that there was sufficient evidence of exclusive dealing and tying arrangements violative of the antitrust laws to go to the jury.

---

25. See also White Motor Co. v. United States, 372 U.S. 253, 262, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); Stedman, Tying Arrangements, 22 A.B.A. Antitrust Section 64, 69–70 (1963); Paley, Antitrust Pitfalls in Exclusive Dealing, 37 Notre Dame Law. 499, 513–14 (1961–1962).

26. Northern Pac. Ry. v. United States, 356 U.S. 1, 7–8, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). This is because "the vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not." 356 U.S. at 11, 78 S.Ct. at 521, 2 L.Ed.2d 545. See also Osborn v. Sinclair Ref. Co., 286 F.2d 832, 840 (4th Cir. 1960), and 324 F.2d 566 (4th Cir. 1963). And see United States v. General Motors Corp., 121 F.2d 376, 402–403 (7th Cir. 1941).

27. There was testimony that it cost a dealer as much as $5,000 to take over a station pumping 12,000 gallons of gasoline a month, although, of course, a portion of this initial expense would be recovered. And, as Tidewater itself points out, under California law (Cal.Bus. & Prof.Code, §§ 20840, 20849–20851), "in order lawfully to handle gasoline acquired from others, Lessig would either have had to install a separate set of tanks and pumps or to relabel those already at the station." Tidewater urges this as the real reason Lessig bought gasoline only from Tidewater.

Compare Brown Shoe Co. v. United States, 370 U.S. 294, 337–338 n. 66, 82 S.Ct. 1502, 1530–1531, 8 L.Ed.2d 510 (1962), where, in another context, the Court said: "Since the retailer was required, under this plan, to invest his own resources and develop his good will to a substantial extent in the sale of Brown products, the flow of which Brown could readily terminate, Brown was able to exercise sufficient control over these stores and departments to warrant their characterization as 'Brown' outlets * * *."

## B. *Sufficiency of evidence of damage*

Tidewater argues that even so there was insufficient proof of damage to justify submission to the jury of this phase of Lessig's case.[28]

■ Lessig did not contend that the alleged exclusive dealing and tying arrangements led to the cancellation of his lease; and we agree with Tidewater that there is little evidence that Lessig was damaged prior to the termination of his lease by the requirement that he purchase petroleum products exclusively from Tidewater.[29] However, there was evidence that the prices which Lessig paid for sponsored TBA during his occupancy of the station were higher than those at which such items were available from other sources. Evidence that a merchant has been required to pay more for goods which he resells is sufficient to establish, prima facie, that he has been damaged;[30] tested by common experience, such proof is adequate to "establish with reasonable probability" that

profits on resale were less. Flintkote Co. v. Lysfjord, 246 F.2d 368, 392 (9th Cir. 1957).[31]

■ Tidewater argues that higher cost of sponsored TBA would not necessarily mean lower dealer profits because competitive TBA might not be equally salable and its purchase, even at lower prices, might lead to diminished profits through fewer sales, lower resale price, and narrowed margins. Under Tidewater's hypothesis, the only wholly satisfactory evidence of damage would be a record of sales of both competitive and sponsored brands of TBA at Lessig's service station during the same period. Since, *arguendo*, Tidewater's illegal activity made the production of such evidence impossible by preventing Lessig from dealing in competitive TBA, Tidewater cannot complain that the preferred proof was not produced.[32]

■ As to the amount of damage, the evidence showed how much more some items of sponsored TBA cost than com-

**28.** See Simpson v. Union Oil Co., 311 F.2d 764, 767–768, (9th Cir. 1963), cert. granted 373 U.S. 901, 83 S.Ct. 1290, 10 L.Ed.2d 197 (1963). Authorities are collected in Timberlake, The Legal Injury Requirements and Proof of Damages in Treble Damage Actions under the Antitrust Laws, 30 Geo.Wash.L.Rev. 231, 232 (1961–1962).

**29.** It does not follow that inquiry as to the legality of Tidewater's alleged exclusive dealing practices is foreclosed to the extent these practices related to petroleum products. Such a compartmentalization of Lessig's case would be inconsistent with the practical interrelationship of the business conduct involved and with the mandate of Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

**30.** See Osborn v. Sinclair Ref. Co., 324 F.2d 566 (4th Cir. 1963). Cf. Flintkote Co. v. Lysfjord, 246 F.2d 368, 389–390 (9th Cir. 1957). See Comment, 60 Mich. L.Rev. 1104, 1123–24 (1961–1962). See also North Texas Producers Ass'n v. Young, 308 F.2d 235, 243–244 (5th Cir. 1962). Cases denying recovery where it appears that plaintiff has passed the

higher price on to his customers without loss to himself are, of course, inapplicable. See, e. g., Wolfe v. National Lead Co., 225 F.2d 427, 433 (9th Cir. 1955); Comment, 60 Mich.L.Rev. 1104, 1129 n. 80 (1961–1962). But see Hanover Shoe, Inc. v. United Shoe Mach. Corp., 281 F.2d 481 (3d Cir. 1960).

**31.** Indeed, we have said that where a violation adversely affects the market in which the plaintiff must buy or sell, "[t]he mere unlawful combination over a period of time to eliminate competition is proof of damage." Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp., 264 F.2d 602, 608 (9th Cir. 1958). See also Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, 713 (9th Cir. 1959). Cf. Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 579–580 (10th Cir. 1961). But see Timberlake, The Legal Injury Requirements and Proof of Damages in Treble Damage Actions under the Antitrust Laws, 30 Geo.Wash.L.Rev. 231, 239–40 (1961–1962).

**32.** Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

petitive brands and the quantity of the former Lessig purchased,[33] and there was nothing in the record to support Tidewater's suggestion that competitive TBA might have been less salable or more costly to sell. This was "relevant data" from which the jury could have made "a just and reasonable estimate" of damage. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

## C. Alleged error in instructions

 Relying upon Standard, Lessig requested the court to instruct the jury that if it found Tidewater's dealer contracts imposed an exclusive dealing requirement [34] with respect to petroleum products, "and this practice affected a substantial amount of commerce, you should find that defendant has violated the antitrust laws." The instruction was properly refused. As Tidewater points out, more appeared in Standard than that the offending contracts affected a substantial amount of commerce in petroleum products.

 We agree with Lessig, however, that the jury was not sufficiently advised that illegal tying arrangements might be found in tacit conditions or understandings inferred from all the circumstances of the case. Tidewater points to the use of the adjectives "express or implied" in the pertinent instructions, but an adequate explanation of the concept of tacit

conditions or understandings established circumstantially cannot be conveyed by a phrase. The danger of confusion was increased by language repeatedly emphasizing the necessity for an agreement.[35]

The court's instructions conditioned recovery upon a finding that Lessig entered into an exclusive dealing or tying arrangement with Tidewater. But Lessig's charge was broader;[36] he also alleged that Tidewater sought to impose these arrangements upon all its dealers. If Lessig proved damage to himself from such a course of conduct—for example, by cancellation of his lease and dealer contract because he refused to become a party to a system of illegal exclusive dealing and tying arrangements—we see no reason why he could not recover. He clearly could if the arrangements violated the Sherman Act.[37] Doubt has been raised that proximate cause can be shown where only the Clayton Act is offended, but we believe the distinction untenable. Lessig's allegation that Tidewater established a system of restrictive arrangements is essential to his Clayton Act case because an exclusive dealing and tying arrangement with Lessig alone could not have had the probable effect upon commerce required to make out a violation. Since it is the entire system of conditions and understandings which violate the Clayton Act, injury to a dealer resulting from Tidewater's efforts to establish and maintain that system is injury

33. Lessig testified, for example, that competitive batteries were "from four dollars to five dollars cheaper" than Tidewater's "Flying A" batteries, and the record disclosed that Lessig purchased 31 of the latter during 1956.

34. Lessig contended that the contract required dealers to purchase their full requirements of petroleum products from Tidewater. Tidewater argued that the language meant only that dealers were to buy their full requirements of Tidewater trademarked products directly from Tidewater, and that they were free to buy products produced by others whenever and from whatever source they wished.

35. The statement in the instructions that Lessig must have "committed himself in advance" to buy sponsored TBA items only from Tidewater should be avoided. Although it may mean in advance of purchase, as Tidewater suggests, as Lessig suggests it may also be taken to mean that the condition or understanding must exist at the outset of the relationship between buyer and seller, thus precluding a finding of tacit condition or understanding based on a subsequent course of conduct.

36. The charge was apparently limited in Leo J. Meyberg Co. v. Eureka Williams Corp., 215 F.2d 100 (9th Cir. 1954).

37. See note 7.

"by reason of" conduct forbidden by the Act.[38]

The court instructed the jury that there was no evidence from which it could find that Tidewater's conduct might "tend to create a monopoly" in TBA, leaving to the jury only the question of whether it might "substantially lessen competition." In the context of this case the distinction is scarcely clear; it was not taken in Standard or Richfield, and we can find no reason to take it here. The Clayton Act's prohibition of agreements which "tend to create a monopoly" is violated though "the tendency is a creeping one rather than one that proceeds at full gallop; nor does the law await arrival at the goal before condemning the direction of the movement." International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947).[39]

The jury was instructed that Tidewater could "urge and encourage" its dealers to buy "all their TBA" from Tidewater, and "express disappointment" if it found they were buying from others. We think the instruction went too far. If the evidence established that Tidewater followed the course of conduct described and that Tidewater's dealers thereafter purchased from it their requirements of sponsored TBA items, an inference of tacit agreement would be virtually compelled. The instruction thus might preclude the jury from finding tacit agreement from circumstances which would justify such a finding.[40]

Lessig's remaining objections to instructions relating to TBA tying and exclusive dealing arrangements seem to us inconsequential, unlikely to arise again, or clearly without merit.

D. *Alleged error in exclusion of evidence*

One of Lessig's contentions concerning the exclusion of evidence relating to this phase of the case merits comment. Lessig complains that he was not permitted to state his opinion as to the profit which he lost as a result of Tidewater's alleged conduct. Such opinion testimony is admissible,[41] but only if based upon facts which rationally support it.[42] The offer of proof was simply that it was Lessig's opinion, based upon his experience and knowledge, that but for Tidewater's restrictive practices his earnings would have approximated seven hundred dollars a month, or about four hundred dollars per month more than

---

38. See Halper, Individual Refusals to Deal: Customer Selection or Dealer Protection, 22 A.B.A. Antitrust Section 49, 60–61 (1963); Turner, The Definition of Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 693–95 (1962); Kessler and Stern, Competition, Contract, and Vertical Integration, 69 Yale L.J. 1, 86 (1959–1960).

39. See also Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213–214, 79 S.Ct. 705, 3 L.Ed.2d 207 (1959).

40. Cf. Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, 713 (9th Cir. 1959): "As the trial judge stated during discussion with counsel, Richfield 'had no right to tell the operators of stations, independent operators and not [Richfield] employees, not to buy other products.'" See also United States v. General Motors Corp., 121 F.2d 376, 400–401 (7th Cir. 1941).
The instruction was also objectionable unless qualified as indicated in Continental Ore Co. See notes 14, 15 and related text. This applies also to the following instructions given by the trial court in connection with the exclusive dealing and tying arrangements phase of the case: that Tidewater was entitled to engage in the business of selling TBA to its dealers; that it was not unlawful for Tidewater to restrict use of its credit cards to the resale of merchandise which the dealer had purchased from Tidewater; that it was not unlawful for Tidewater to introduce to its dealers representatives of TBA manufacturers from whom Tidewater bought merchandise; and that Tidewater's volume TBA discounts to dealers were lawful.

41. Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 595 (10th Cir. 1962). See also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 567, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

42. Cf. Flintkote Co. v. Lysfjord, 246 F.2d 368, 394 (9th Cir. 1957).

he in fact averaged. There was no offer to show how his estimate was made. The testimony was inadmissible, absent this foundation, and it was excluded upon that express ground.

## III

### Attempt to Monopolize

■ We think the court erred in withdrawing from the jury the charge that Tidewater attempted to monopolize in violation of Section 2 of the Sherman Act.

■ The essence of monopoly is power to control prices and exclude competition,[43] and what we have said demonstrates that there was evidence that Tidewater possessed the specific intent to acquire and exercise such power with respect to a part of commerce.[44]

Tidewater argues that attempt to monopolize is established only if there is proof of "dangerous probability of success, i. e., that if unchecked monopolization will result"; that this requires an evaluation of Tidewater's power in the relevant market; that the evidence on this issue was inadequate, and such evidence as there was indicated a lack of any possibility that Tidewater could monopolize the sale of petroleum products or TBA.

■ We reject the premise that probability of actual monopolization is an essential element of proof of attempt to monopolize.[45] Of course, such a probability may be relevant circumstantial evidence of intent, but the specific intent itself is the only evidence of dangerous probability the statute requires—perhaps on the not unreasonable assumption that the actor is better able than others to judge the practical possibility of achieving his illegal objective.[46]

■■ When the charge is attempt (or conspiracy) to monopolize, rather than monopolization, the relevant market is "not in issue." United States v. E. I. Du Pont & Co., 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).[47] Section 2 prohibits attempts to monopolize "any part" of commerce, and a dominant position in the business of distributing petroleum products and TBA

43. See, e. g., American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

44. A contract, combination or conspiracy to fix prices, or to exclude competition from a substantial part of the market, violates both § 1 and § 2 of the Act. In addition, § 2 is violated by any *attempt* to accomplish the forbidden objectives; "having by the first section forbidden all means of monopolizing trade, that is, unduly restraining it by means of every contract, combination, etc., the second section seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about or are brought about be not embraced within the general enumeration of the first section." Standard Oil Co. of N. J. v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911).

45. Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 586 (10th Cir. 1961); United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1961). Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 284 F.2d 1 (9th Cir. 1960), is not to the contrary, as Tidewater suggests. Cf. Kansas City Star Co. v. United States, 240 F.2d 643, 662–663 (8th Cir. 1957).

46. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905) ("* * * when that intent and the *consequent* dangerous probability exist * * *." (Emphasis added.)) See also United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 667 (9th Cir. 1963).

47. See also Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 667 (9th Cir. 1963); Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 585 (10th Cir. 1961). Cf. Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 389–390 (6th Cir. 1962).

was not necessarily prerequisite to ability to attempt to monopolize an appreciable segment of interstate sales in such products.[48] If the jury found that Tidewater intended to fix the price at which 2,700 independent service station operators resold gasoline, and to exclude other suppliers of petroleum products and sponsored TBA items from competing for the patronage of these operators, and took steps to accomplish that purpose, it could properly conclude that Tidewater attempted to monopolize a part of interstate commerce in violation of Section 2 of the Sherman Act.[49]

Reversed and remanded.

MADDEN, Judge (dissenting):

I think it is a serious mistake to send this case back to the District Court for retrial. The trial here under review used up nine days of the time of a judge and jury and the staff of the court. The jury brought in a verdict for the defendant. I think it is practically impossible that another jury on a retrial would reach a different verdict.

The plaintiff, who had had some experience operating different service stations which sold Shell, Standard and Richfield gasoline, in May of 1955 leased from the defendant Tidewater an old service station, on condition that the defendant would modernize the station. The defendant did modernize it, at a cost to it of $29,000. The plaintiff has no criticism of the station. The plaintiff's lease was dated November 15, 1955. It provided that it was subject to termination at the end of the first or any subsequent six months' period by either party. At the time of the execution of the lease the parties entered into a "dealer contract." This contract was for the period

November 15, 1955, to November 14, 1958, with a right in the defendant to extend it to November 14, 1960. The contract provided, however, that it should terminate if the plaintiff's lease terminated. In the dealer contract the defendant agreed to sell the plaintiff his requirements of gasoline, motor oils and greases manufactured by the defendant, so long as the contract was in force.

The plaintiff's lease provided for a rent of $67.34 a month, plus one cent for each gallon of gasoline delivered to the station. The $67.34 was, of course, insignificant in relation to the investment which the defendant had made in the station. If the defendant was to get a respectable return on its investment, it would have to get it out of the gallonage provision of the lease. Before the modernization of the station in the autumn of 1955, the station had been, since January 1, 1954, taking just under 10,000 gallons per month. In the first month after modernization, it took 12,500 gallons. Both Tidewater and Lessig had hoped that the gallonage, after modernization, would increase to 20,000. But it did not increase substantially during the 27 months following, up to April, 1958, when the defendant terminated the lease. The defendant's profit for the entire year 1956, before taxes, was $30.38. For the year 1957 the comparable figure was $907. The per-month gallonage in the first three months of 1958 was somewhat less than the gallonage in November, 1955, the first full month after the modernization.

Tidewater was not making any money out of the station and, of course, neither was Lessig. His profits averaged $284.33 per month, which was $80 per month less than he began to earn, working for

48. Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); United States v. Yellow Cab Co., 332 U.S. 218, 226, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

49. See Crane Distrib. Co. v. Glenmore Distilleries, 267 F.2d 343, 345 (6th Cir. 1959); American Tobacco Co. v. United States, 147 F.2d 93, 113 (6th Cir. 1944),

aff'd 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). See also Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213–214, 79 S.Ct. 705, 3 L.Ed.2d 207 (1959). Klors is not distinguishable because the conspiracy to monopolize involved a boycott; resale price maintenance is also a per se violation of the Sherman Act.

the defendant's station.

another man, immediately after he left

Postponing, for the time being, any legal problems, and looking at the economics of the operation of the station during the period of the plaintiff's tenancy, it is obvious that the situation was intolerable. The owner was making substantially nothing and the operator, although he worked long hours and had the use of the owner's large capital investment, was making a meager living. If there was a reasonable hope that a more efficient operator might develop more business, that would be good for the owner. Was the owner at liberty to make a change? As we have seen, the lease was terminable at the end of any six months' period by either party, and the dealer contract terminated automatically with termination of the lease. As we have seen, Tidewater did terminate the lease in April, 1958. Under the new operator, the gallonage increased significantly and regularly, to 15,000 gallons in the remaining months of 1958, almost 16,000 gallons in 1959, over 17,000 gallons in 1960 and 1961, and in several months of the latter three years it exceeded 20,000 gallons.

Turning from the economic to the legal questions, the plaintiff complains that the defendant, in its dealings with him, violated sections 1 and 2 of the Sherman Anti-Trust Act[1] and section 3 of the Clayton Act,[2] and thereby made itself liable to him, under section 4 of the Clayton Act,[3] for the damages which the defendant caused him, multiplied by three.

So far as concerns section 1 of the Sherman Act, the plaintiff would spell out of certain remarks and remonstrances of the defendant's agents a contract with him to fix the price at which he could resell gasoline which the defendant had sold to him. The defendant, hoping that the plaintiff would sell enough gasoline so that the defendant might make more than $30.38 or $907 profit, before

taxes, in a year, on a very large capital investment, found the plaintiff charging several cents more per gallon than his adjacent competitors and, naturally, not selling much gasoline. The defendant's agents thought this was not a wise way to do business, which it obviously was not, and told the plaintiff so. In all common sense, does the Sherman Act forbid a man, just because he is engaged in business, from speaking the obvious truth, when the unwise and obstinate conduct of which he speaks is lifting money out of his pocket? The plaintiff testified, repeatedly, that he paid no attention to the suggestions of the defendant's agents that he reduce his prices, and that he fixed his own prices. Since he fixed his own prices, he could not have been damaged by the defendant's suggestions that he reduce prices, even if it were possible to conjure a contract out of a rejected suggestion.

The plaintiff says that the defendant violated section 3 of the Clayton Act, and thereby became liable to him under section 4 of that act, by requiring him to buy his tires, batteries and accessories (TBA) from the defendant or from those enterprises with which the defendant had arrangements under which the defendant would make a profit from their sales. There was nothing in the dealer's contract between the plaintiff and the defendant which provided for any such tying. There is evidence that the defendant's salesmen of its own TBA solicited sales to the plaintiff, and that the defendant's agents introduced to the plaintiff the salesmen of other enterprises with which the defendant had arrangements under which the defendant would make a profit if the TBA were sold to the operators of the defendant's stations. As to whether there was a "condition, agreement or understanding" arising by implication out of the conduct or conversation of the parties, restricting the plaintiff as to where he

1. 15 U.S.C. §§ 1, 2.

2. 15 U.S.C. § 14.

3. 15 U.S.C. § 15.

might purchase his TBA, again, as in the case of the pricing of the gasoline, actions speak louder than implications. From the beginning of his lease in 1955, Lessig bought from many other sellers than Tidewater or Tidewater-sponsored sellers, TBA of types which were in direct competition with those sold or sponsored by Tidewater. There is no evidence of any occasion on which the plaintiff even acted as if he felt any inhibition about buying his TBA where he pleased. There is, in the plaintiff's argument, the fantastic suggestion that Tidewater's refusal to pay Lessig for TBA bought from sellers with which Tidewater had no connection and sold to customers on Tidewater's credit cards was some sort of a violation of the antitrust laws.

The court recognizes that most of the plaintiff's numerous complaints about instructions are unfounded, because the plaintiff made no objection to the ones given, or the content of the ones which the plaintiff says should have been, but were not, given was adequately covered by instructions given.

The court finds however, that there was one instruction requested by the plaintiff and not given by the court as to which the plaintiff's claim of prejudicial error has merit. In the suit the plaintiff claimed, as we know, that he suffered loss during the period of his lease and dealer contract as a result of the defendant's alleged practice of dictating the price at which he had to resell his gasoline. The court says, "The evidence supporting Lessig's claim of injury from Tidewater's resale price-fixing activities prior to the termination of his lease and contract was not strong." That is an understatement. Such evidence, it seems to me, was non-existent. But the court goes on to say, "However, the jury could readily infer that Tidewater terminated its business relationship with Lessig because he failed to adhere to the resale price fixing scheme. * * * Lessig could claim compensation for the resulting loss, including reasonably anticipated

future profits, and there was evidence from which the jury could find that such a loss occurred." Then the court goes on to hold that an instruction, requested by the plaintiff and not given, relating to future profits not realized because of the cancellation of his lease and contract, should have been given, and that the court's failure to give it was prejudicial error.

In my opinion, the plaintiff's requested instruction was correctly refused. Since it is crucial to the court's decision, I quote it:

"A plaintiff whose lease and product agreements have been cancelled as a result of conduct in violation of the antitrust laws is entitled to be awarded as damages the loss of profits and values resulting from the cancellations.

"If you find that Paul Lessig had developed net income and profits at the service station at 22nd and Irving Street, San Francisco during the period May, 1955 to May 15, 1958, and there was reasonable likelihood that such net earnings and profits would have continued in the future you may award as damages the value of such future profits as of the date of cancellation."

The first paragraph is a statement of law. The second paragraph is a peremptory statement, not conditioned upon any finding by the jury that the defendant had violated the law stated in the first paragraph, but flatly telling the jury that if it found that the plaintiff had had net earnings during the period of the lease and would have had net earnings if the lease had not been cancelled, it should award the plaintiff those future potential net earnings. The plaintiff had, in several of his requests, sought to get the court to give peremptory instructions such as "Tidewater has unlawfully controlled retail prices of dealers." If the requested instruction here under discussion had been given, the plaintiff would have, by indirection, succeeded in getting

what had been properly denied him in dealing with his other requests. The giving of this instruction would, I think, have been prejudicial error if the verdict had gone against the defendant.

I comment further on the requested instruction which I have quoted above. It would have given the jury no guide whatever as to how far into the future they were to project their award of damages. The plaintiff had, during the period of his lease, averaged $284.33 per month of earnings from the station. This was a meager living; it was $80 less per month than he immediately began to earn working for another man after he left the station. Was he to get $284.33 per month, multiplied by his expectancy of earning capacity as shown by reliable tables, trebled by the Clayton Act, and with or without deductions for other earnings which he might be expected to receive, and a discount for prepayment of a lifetime, or some period less than a lifetime, of earnings? It was the plaintiff's responsibility to state some objective less remote than the sky by which the jury should measure his damages if it concluded that his rights had been violated.

I suggest, with deference to the court, that the jury could hardly have been misled into thinking that it could not award damages, if any, resulting from the illegal cancellation of the lease, if it found that there had been an illegal cancellation. The court, in its instructions, several times stated the usual general rule as to the measure of damages in a law-suit, including the loss of profits. The court instructed the jury, "You may specifically base your award of damages * * * on the testimony of expert witnesses." There were only two expert witnesses. The entire testimony of one of them related to the alleged losses of the plaintiff resulting from the cancellation of the lease, and the testimony of the other expert, so far as it related to damages, was with regard to Lessig's earnings after the lease was cancelled.

The plaintiff's counsel argued emphatically to the jury that the plaintiff should be awarded damages based upon lost future earnings resulting from the cancellation of the lease. It is fair to plaintiff's counsel to recognize that he specifically disclaimed any right to project damages "in perpetuity" and asked the jury only for future damages down to November 14, 1960. I think the trial judge was correct in not, of his own motion and as a work of supererogation, prescribing to the jury a rule for measuring future damages. He apparently assumed that, if the jury found that the plaintiff was entitled to such damages, it would measure them by a rule of common sense.

The task of a trial court in threading its way through the intricacies of an anti-trust suit is difficult and troublesome. The generalities of the statutes, the variations in the language and the conclusions in the reported decisions add to the difficulties. When the trial court has patiently and intelligently moderated the trial, and a jury has passed upon the evidence, I think it is a mistake for an appellate court to yield to counsel's urging to find some departure from perfection in this complex human proceeding. I think the judgment was right and I would affirm it.

On Petition for Rehearing

PER CURIAM.

The petition for rehearing and the motion of amici curiae for leave to file a statement in support thereof are denied. Judge MADDEN would grant the petition and motion.

The earnestness with which Tidewater suggests that Part III of the opinion may be read as rendering illegal any competitive effort to gain a share of available business leads us to add what might seem to be obvious: that Part III of the opinion is to be read with the remainder, and in light of the anti-competitive purposes and conduct to which the case relates.