377 U.S. 13 (1964)
SIMPSON
v.
UNION OIL CO. OF CALIFORNIA.
No. 87.
Supreme Court of United States.
Argued January 15-16, 1964.
Decided April 20, 1964.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.
*14 Maxwell Keith argued the cause and filed briefs for petitioner.
Moses Lasky argued the cause and filed a brief for respondent.
MR. JUSTICE DOUGLAS delivered the opinion of the Court.
This is a suit for damages under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, for violation of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 50 Stat. 693, 15 U. S. C. §§ 1, 2. The complaint grows out of a so-called retail dealer "consignment" agreement which, it is alleged, Union Oil requires lessees of its retail outlets to sign, of which Simpson was one. The "consignment" agreement is for one year and thereafter until canceled, is terminable by either party at the end of any year and, by its terms, ceases upon any termination of the lease. The lease is also for one year; and it is alleged that it is used to police the retail prices charged by the consignees, renewals not being made *15 if the conditions prescribed by the company are not met. The company, pursuant to the "consignment" agreement, sets the prices at which the retailer sells the gasoline. While "title" to the consigned gasoline "shall remain in Consignor until sold by Consignee," and while the company pays all property taxes on all gasoline in possession of Simpson, he must carry personal liability and property damage insurance by reason of the "consigned" gasoline and is responsible for all losses of the "consigned" gasoline in his possession, save for specified acts of God. Simpson is compensated by a minimum commission and pays all the costs of operation in the familiar manner.
The retail price fixed by the company for the gasoline during the period in question was 29.9 cents per gallon; and Simpson, despite the company's demand that he adhere to the authorized price, sold it at 27.9 cents, allegedly to meet a competitive price. Solely because Simpson sold gasoline below the fixed price, Union Oil refused to renew the lease; termination of the "consignment" agreement ensued; and this suit was filed. The terms of the lease and "consignment" agreement are not in dispute nor the method of their application in this case. The interstate character of Union Oil's business is conceded, as is the extensive use by it of the lease-consignment agreement in eight western States.[1]
After two pretrial hearings, the company moved for a summary judgment. Simpson moved for a partial summary judgmentthat the consignment lease program is *16 in violation of §§ 1 and 2 of the Sherman Act. The District Court, concluding that "all the factual disputes" had been eliminated from the case, entertained the motions. The District Court granted the company's motion and denied Simpson's, holding as to the latter that he had not established a violation of the Sherman Act and, even assuming such a violation, that he had not suffered any actionable damage. The Court of Appeals affirmed. While it assumed that there were triable issues of law, it concluded that Simpson suffered no actionable wrong or damage, 311 F. 2d 764. The case is here on a writ of certiorari. 373 U. S. 901.
We disagree with the Court of Appeals that there is no actionable wrong or damage if a Sherman Act violation is assumed. If the "consignment" agreement achieves resale price maintenance in violation of the Sherman Act, it and the lease are being used to injure interstate commerce by depriving independent dealers of the exercise of free judgment whether to become consignees at all, or remain consignees, and, in any event, to sell at competitive prices. The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws.
There is actionable wrong whenever the restraint of trade or monopolistic practice has an impact on the market; and it matters not that the complainant may be only one merchant. See Klor's v. Broadway-Hale Stores, 359 U. S. 207, 213; Radiant Burners v. Peoples Gas Co., 364 U. S. 656, 660. As we stated in Radovich v. National Football League, 352 U. S. 445, 453-454:
"Congress has, by legislative flat, determined that such prohibited activities are injurious to the public and has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public."
*17 The fact that, on failure to renew a lease, another dealer takes Simpson's place and renders the same service to the public is no more an answer here than it was in Poller v. Columbia Broadcasting System, 368 U. S. 464, 473. For Congress, not the oil distributor, is the arbiter of the public interest; and Congress has closely patrolled price fixing whether effected through resale price maintenance agreements or otherwise.[2] The exclusive requirements contracts struck down in Standard Oil Co. v. United States, 337 U. S. 293, were not saved because dealers need not have agreed to them, but could have gone elsewhere. If that were a defense, a supplier could regiment thousands of otherwise competitive dealers in resale price maintenance programs merely by fear of nonrenewal of short-term leases.
We made clear in United States v. Parke, Davis & Co., 362 U. S. 29, that a supplier may not use coercion on its retail outlets to achieve resale price maintenance. We reiterate that view, adding that it matters not what the coercive device is. United States v. Colgate, 250 U. S. 300, as explained in Parke, Davis, 362 U. S., at 37, was a case where there was assumed to be no agreement to maintain retail prices. Here we have such an agreement; it is used coercively, and, it promises to be equally if not more effective in maintaining gasoline prices than were the Parke, Davis techniques in fixing monopoly prices on drugs.
Consignments perform an important function in trade and commerce, and their integrity has been recognized by many courts, including this one. See Ludvigh v. American Woolen Co., 231 U. S. 522. Yet consignments, though useful in allocating risks between the parties and determining their rights inter se, do not necessarily control *18 the rights of others, whether they be creditors or sovereigns. Thus the device has been extensively regulated by the States. 22 Am. Jur., Factors, § 8; Hartford Indemnity Co. v. Illinois, 298 U. S. 155. Congress, too, has entered parts of the field, establishing by the Act of June 10, 1930, 46 Stat. 531, as amended, 7 U. S. C. § 499a et seq., a pervasive system of control over commission merchants dealing in perishable agricultural commodities.
One who sends a rug or a painting or other work of art to a merchant or a gallery for sale at a minimum price can, of course, hold the consignee to the bargain. A retail merchant may, indeed, have inventory on consignment, the terms of which bind the parties inter se. Yet the consignor does not always prevail over creditors in case of bankruptcy, where a recording statute or a "traders act" or a "sign statute" is in effect. 4 Collier, Bankruptcy (14th ed.), pp. 1090-1097, 1484-1486. The interests of the Government also frequently override agreements that private parties make. Here we have an antitrust policy expressed in Acts of Congress. Accordingly, a consignment, no matter how lawful it might be as a matter of private contract law, must give way before the federal antitrust policy. Thus a consignment is not allowed to be used as a cloak to avoid § 3 of the Clayton Act. See Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 353-356; cf. Straus v. Victor Talking Mach. Co., 243 U. S. 490, 500-501. Nor does § 1 of the Sherman Act tolerate agreements for retail price maintenance. See United States v. Socony-Vacuum Oil Co., 310 U. S. 150, 221-222; United States v. Parke, Davis & Co., supra.
We are enlightened on present-day marketing methods by recent congressional investigations. In the automobile field the price is "the manufacturer's suggested retail price,"[3] not a price coercively exacted; nor do automobiles *19 go on consignment; they are sold.[4] Resale price maintenance of gasoline through the "consignment" device is increasing.[5] The "consignment" device in the gasoline field is used for resale price maintenance. The theory and practice of gasoline price fixing in vogue under the "consignment" agreement has been well exposed by Congress. A Union Oil official in recent testimony before a House Committee on Small Business explained the price mechanism:
"Mr. ROOSEVELT. Who sets the price in your consignment station, dealer consignment station?
"Mr. RATH. We do.
"Mr. ROOSEVELT. You do?
"Mr. RATH. Yes. We do it on this basis: You see, he is paid a commission to sell these products for us. Now, we go out into the market area and find out what the competitive major price is, what that level is, and we set our house-brand price at that."[6]
*20 Dealers, like Simpson, are independent businessmen; and they have all or most of the indicia of entrepreneurs, except for price fixing. The risk of loss of the gasoline is on them, apart from acts of God. Their return is affected by the rise and fall in the market price, their commissions declining as retail prices drop.[7] Practically *21 the only power they have to be wholly independent businessmen, whose service depends on their own initiative and enterprise, is taken from them by the proviso that they must sell their gasoline at prices fixed by Union Oil. By reason of the lease and "consignment" agreement dealers are coercively laced into an arrangement under which their supplier is able to impose noncompetitive prices on thousands of persons whose prices otherwise might be competitive. The evil of this resale price maintenance program, like that of the requirements contracts held illegal by Standard Oil Co. v. United States, supra, is its inexorable potentiality for and even certainty in destroying competition in retail sales of gasoline by these nominal "consignees" who are in reality small struggling competitors seeking retail gas customers.
As we have said, an owner of an article may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner. There is nothing illegal about that arrangement. When, however, a "consignment" device is used to cover a vast gasoline distribution system, fixing prices through many retail outlets, the antitrust laws prevent calling the "consignment" an agency,[8] for then the end result of United States v. Socony-Vacuum *22 Oil Co., supra, would be avoided merely by clever manipulation of words, not by differences in substance. The present, coercive "consignment" device, if successful against challenge under the antitrust laws, furnishes a wooden formula for administering prices on a vast scale.[9]
Reliance is placed on United States v. General Electric Co., 272 U. S. 476, where a consignment arrangement was utilized to market patented articles. Union Oil correctly argues that the consignment in that case somewhat *23 parallels the one in the instant case.[10] The Court in the General Electric case did not restrict its ruling to patented articles; it, indeed, said that the use of the consignment device was available to the owners of articles "patented or otherwise." Id., at 488. But whatever may be said of the General Electric case on its special facts, involving patents, it is not apposite to the special facts here.
The Court in that case particularly relied on the fact that patent rights have long included licenses "to make, use and vend" the patented article "for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure." Id., at 489. Congress in establishing the patent system included 35 U. S. C. § 154, which provides in part: "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, of the right to exclude others from making, using, or selling the invention throughout the United *24 States, referring to the specification for the particulars thereof." (Italics added.)
"The right to manufacture, the right to sell, and the right to use are each substantive rights, and may be granted or conferred separately by the patentee." Adams v. Burke, 17 Wall. 453, 456. Long prior to the General Electric case, price fixing in the marketing of patented articles had been condoned (Bement v. National Harrow Co., 186 U. S. 70), provided it did not extend to sales by purchasers of the patented articles. Adams v. Burke, supra; Ethyl Gasoline Corp. v. United States, 309 U. S. 436.
The patent laws which give a 17-year monopoly on "making, using, or selling the invention" are in pari materia with the antitrust laws and modify them pro tanto. That was the ratio decidendi of the General Electric case. See 272 U. S., at 485. We decline the invitation to extend it.
To allow Union Oil to achieve price fixing in this vast distribution system through this "consignment" device would be to make legality for antitrust purposes turn on clever draftsmanship. We refuse to let a matter so vital to a competitive system rest on such easy manipulation. Cf. United States v. Masonite Corp., 316 U. S. 265, 280.
Hence on the issue of resale price maintenance under the Sherman Act there is nothing left to try, for there was an agreement for resale price maintenance, coercively employed.
The case must be remanded for a hearing on all the other issues in the case, including those raised under the McGuire Act, 66 Stat. 631, 15 U. S. C. § 45, and the damages, if any, suffered. We intimate no views on any other issue; we hold only that resale price maintenance through the present, coercive type of "consignment" agreement is illegal under the antitrust laws, and that petitioner suffered actionable wrong or damage. We reserve the question *25 whether, when all the facts are known, there may be any equities that would warrant only prospective application in damage suits of the rule governing price fixing by the "consignment" device which we announce today.
Reversed and remanded.
MR. JUSTICE HARLAN took no part in the disposition of this case.
MR. JUSTICE STEWART, dissenting.
In this case the District Court granted a summary judgment in favor of the respondent, finding that the respondent had not violated the Sherman Act, and that even if there had been a violation, the petitioner had not suffered any damages. The Court of Appeals affirmed upon the theory that, even assuming a Sherman Act violation, "any damage occurring to Simpson was the result of his own free and deliberate choice and he could not deliberately and knowingly enter into contractual obligations and then and thereafter contend he was injured by the results of his own acts." 311 F. 2d 764, at 769.
I think the reasoning upon which the Court of Appeals proceeded is untenable. The gravamen of the petitioner's complaint was that he had been coerced into a lease conditioned upon acceptance of the respondent's allegedly unlawful system of selling. If, as the Court of Appeals assumed, there had been such a violation of the Sherman Act, it was inconsistent to assume that the petitioner could not have been subject to the coercion he alleged and could not have suffered damages. But the root error in this case, it seems to me, was the District Court's decision to terminate the controversy by way of a summary judgment. I therefore agree with the Court that the judgment of the Court of Appeals should be set aside and the case remanded to the District Court for a *26 trial on the merits. Poller v. Columbia Broadcasting System, 368 U. S. 464. But I think that upon remand there should be a full trial of all the issues in this litigation, because I completely disagree with the Court that whenever a bona fide consignor, employing numerous agents, sets the price at which his property is to be sold, "the antitrust laws prevent calling the `consignment' an agency," and transform the consignment into a sale. In the present posture of this case, such a determination, overruling as it does a doctrine which has stood unquestioned for almost 40 years, is unwarranted, unnecessary and premature.
In United States v. General Electric, 272 U. S. 476, this Court held that a bona fide consignment agreement of this kind does not violate the Sherman Act. The Court today concedes that "the consignment in that case somewhat parallels the one in the instant case." The fact of the matter is, so far as the record now before us discloses, the two agreements are virtually indistinguishable.[1] Instead of expressly overruling General Electric, *27 however, the Court seeks to distinguish that case upon the specious ground that its underpinnings rest on patent law.
It is, of course, true that what was sold in General Electric was not gasoline, but lamp bulbs which had been manufactured under a patent. But until today no one has ever considered this fact relevant to the holding in *28 that case that bona fide consignment agreements do not violate the antitrust laws "however comprehensive as a mass or whole in their effect . . . ." Id., at 488. In addition to the unambiguous statement in Chief Justice Taft's opinion for a unanimous Court that "[t]he owner of an article, patented or otherwise, is not violating the common law, or the Anti-Trust law, by seeking to dispose of his article directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer," 272 U. S., at 488, the Court, throughout that portion of its opinion dealing with the validity of General Electric's consignment agreements, gave no intimation whatsoever that its conclusion would have differed in any respect if the consigned article had been unpatented. Quite the contrary, the General Electric Court, assessing the validity of these agreements, addressed itself to but one question: "The question is whether, in view of the arrangements, made by the company with those who ordinarily and usually would be merchants buying from the manufacturer and selling to the public,such persons are to be treated as agents, or as owners of the lamps consigned to them under such contracts." 272 U. S., at 483-484.
To answer that question, the Court examined the operative provisions of the consignment agreement to determine whether the agreement created a valid agency or whether, in fact, title effectively passed to the so-called consignee. Id., at 483-488. If the latter were the case, the price-fixing requirement would have made the agreement nothing more than a resale-price-maintenance scheme, unlawful under the antitrust laws, cf. Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, regardless of whether or not the article sold was patented. Similarly, if the agreement created a bona fide agency, the consignment would be valid under the antitrust laws, again regardless of whether or not the article consigned were patented.
*29 Possession of patent rights on the article allegedly consigned has no legal significance to an inquiry directed to ascertaining whether the burdens, risks, and rights of ownership actually remain with the principal or have passed to his agent. Nor is the power of a consignor to fix the prices at which his consignee sells augmented in any respect by the possession of a patent on the goods so consigned. It is not by virtue of a patent monopoly that a bona fide consignor may control the price at which his consignee sells; his control over price flows from the simple fact that the owner of goods, so long as he remains the owner, has the unquestioned right to determine the price at which he will sell them.[2]
It is clear, therefore, that the Court today overrules General Electric. It does so, even though the validity of that decision was not challenged in the briefs or in oral argument in this case. I should have thought that a decision of such impact and magnitude could properly be reached only after careful consideration of all relevant considerations and preferably by a full Court.[3] Today's upsetting decision carries with it the most severe consequences to a large sector of the private economy. We cannot be blind to the fact that commercial arrangements throughout our economy are shaped in reliance upon this Court's decisions elaborating the reach of the antitrust *30 laws. Everyone knows that consignment selling is a widely used method of distribution all over the country. By our decision today outlawing consignment selling if it includes a price limitation, we inject severe uncertainty into commercial relationships established in reliance upon a decision of this Court explicitly validating this method of distribution. We create, as well, the distinct possibility that an untold number of sellers of goods will be subjected to liability in treble damage suits because they thought they could rely on the validity of this Court's decisions.
If the record now before us actually required re-examination of the General Electric case, I think that in view of the serious considerations which I have mentioned we should set this case for reargument and invite the Justice Department to express its views.[4] But the fact is that in the present posture of this case, this broad issue need not be decided. The record upon which the District Court entered its summary judgment is wholly inadequate to support a realistic assessment of the actual nature and effect of the so-called lease-and-consignment agreement here involved. As the Court of Appeals pointed out, "[t]he record is not an easy one to read. No written pretrial stipulation of facts was entered into nor was any formal pretrial order made. . . . The result of all this was to create a most unsatisfactory record . . . . As the record now stands, it is almost impossible to determine what agreements, if any, were reached at pretrial." 311 F. 2d, at 767.
*31 After a trial on the merits it may be determined that the scheme here involved, although on its face a bona fide lease-and-consignment agreement, was in actual operation and effect a system of resale price maintenance.[5] Or the District Court after a trial might find that despite the formal provisions of the lease-and-consignment agreement, there actually existed here some coercive arrangement otherwise violative of the antitrust laws. In either event, the question of the petitioner's damages would then become an issue to be determined. Only if all these issues, and perhaps others, were resolved in favor of the respondent, would there be presented the question of the continuing validity of the General Electric doctrine. Consequently, re-examination of that case should certainly await another day.
I would vacate the judgment of the Court of Appeals and remand this case to the District Court for a plenary trial of all the issues.
Memorandum of MR. JUSTICE BRENNAN and MR. JUSTICE GOLDBERG.
We do not necessarily disagree with the Court that "resale price maintenance through the present, coercive type of `consignment' agreement is illegal under the antitrust laws, and that petitioner suffered actionable wrong or damage." We think, however, that the Court should not decide that question either as to fact or law on the record upon which this summary judgment was entered. Since the decision may be expected to affect consignment agreements in many businesses, including outstanding agreements that may have been entered into in reliance upon United States v. General Electric, 272 U. S. 476 the Court ought not pronounce that judgment without *32 the benefit of a trial of the question whether this is a "coercive type of `consignment' agreement," and without affording interested parties, including the Antitrust Division of the Department of Justice, an opportunity to express their views. We therefore agree with MR. JUSTICE STEWART and would vacate the judgment of the Court of Appeals and remand this case to the District Court for a plenary trial of all the issues.
NOTES
[1] As of December 31, 1957, Union Oil supplied gasoline to 4,133 retail stations in the eight western States of California, Washington, Oregon, Nevada, Arizona, Montana, Utah and Idaho. Of that figure, 2,003 stations were owned or leased by Union Oil and, in turn, leased or subleased to an independent retailer; 14 were company-operated training stations; and the remaining 2,116 stations were owned by the retailer or leased by him from third persons. Union Oil had "consignment" agreements as of that date with 1,978 (99%) of the lessee-retailers and with 1,327 (63%) of the nonlessee-retailers.
[2] See the McGuire Act, 66 Stat. 631, 15 U. S. C. § 45; the Miller-Tydings Act, 50 Stat. 693, 15 U. S. C. § 1; United States v. Socony-Vacuum Oil Co., 310 U. S. 150.
[3] H. R. Rep. No. 1958, 85th Cong., 2d Sess., S. Rep. No. 1555, 85th Cong., 2d Sess.
[4] H. R. Rep. No. 1958, supra, note 3, at 1.
[5] See H. R. Rep. No. 1157, 85th Cong., 1st Sess., pp. 6-7. The Assistant Attorney General in charge of the Antitrust Division, Department of Justice, testified:

"Another issue relating to price fixing concerns certain of the practices which the major oil companies have used to preserve their tank wagon price structure; for example, the placing of the dealer on a commission or consignment agency basis, which narrows his normal margin of profit and effectively fixes the retail price." Id., at 7. The Committee report said:
"One of the effects of this expansion of commission and consignment outlets is that more and more service station operators lose their status as independent businessmen. The selling price and gross margin of profit per gallon in the commission-type stations are wholly within the control of the supplier." Ibid.
[6] See Hearings, House Select Committee on Small Business, 85th Cong., 1st Sess., H. R. Res. 56, Pt. III, pp. 79-80. The same official gave this justification for the consignment programa justification similar to that traditionally advanced for resale price maintenance:

"Consignment is our method of protecting our dealers' profit margins during disturbed retail price conditions, at the same time maintaining our dealers' positions as people handling a premium quality product. We have not used consignment as a means of unfair competition, nor has it been used to price any dealer out of any station. It has instead been used by us to maintain a competitive relationship between our dealers' prices and those of our competitors.
"We are proud of our retail consignment program which has accomplished the ends outlined above. We have been able to make these accomplishments without taking away any of the independence of our dealers. Through our consignment program we have established and maintained under all conditions the minimum guaranteed margins for our dealers that are the best in the industry. It has brought our dealers one other substantial benefit alsoand I would like to point this out stronglythey have available for other uses the investment which otherwise would be in gasoline inventories. This amounts to an average of $2,500 per dealer.
"If there is any suspicion or resentment by any dealers or dealer groups, it certainly appears that Union Oil Co.'s retail consignment program is a greatly misunderstood one. It does not remove any aspect of a dealer's independence other than giving us the right to name the dealer's selling prices. It has not been used to create or disturb any retail price situations and instead has, as a matter of fact, contributed materially to the economic welfare of our dealers.
"If we were today to withdraw the consignment program as it is now set up, we know that such action would be bitterly opposed by our dealers. Any problems that are laid at its doorstepand there were some problems as there are in any new programhave been corrected to the point that a survey of our dealers today would reveal that the great majority of them are heartily in favor of consignment. We are able to offer the names of hundreds of our dealers who are in favor of the program." Id., at 86-87.
[7] The basic agreement in force during most of the period when Simpson was a consignee provided that his commission was 1 1/2¢ per gallon more than the amount by which the price at which the company "authorized" him to sell exceeded a posted "tank wagon" price applicable to those gallons. However, if the "authorized" price fell below a posted "minimum retail" price, the commission was reduced by 50% of the difference between "minimum retail" and "authorized" retail. In no event could the commission be less than 5.95¢ for regular and 5.75¢ for ethyl.

Shortly before Simpson ceased to be a consignee the program was changed. The guaranteed minimum was eliminated and the consignee absorbed 20% of the difference if "authorized" prices fell below "minimum retail." If the "authorized" price exceeded "minimum retail," the commission increased by 80% of the excess, as compared with 100% thereof under the former plan.
[8] See Klaus, Sale, Agency and Price Maintenance, 28 Col. L. Rev. 312, 441, 443-454 (1928).
[9] A. A. Berle recently described the critical importance of price control to money making by the large oligarchies of business, or the "behemoths" as he calls them:

"Are these behemoths good at making goodsor merely good at making money? Do they come out better because they manufacture more efficientlyor because they `control the market' and collect unduly high prices from the long-suffering American consumer?
"Again, no one quite knows. It is pretty clear that most prices are established only partly by competition, and partly by administration. Economists are just beginning to wrestle with the problem of `administered' prices. The three or four `bigs' in any particular line are happy to stay with a good price level for their product. If the price gets too high, some smart vice president in charge of sales may see a chance to take a fat slice of business away from his competitors.
"But while any one of the two or three bigs knows he can reduce prices and start taking all the business there is, he knows, too, that one or all of his associates will soon drop the price below that. In the ensuing price war, nobody will make money for quite a while.
"So, an uneasy balance is struck, and everyone's price remains about the same. Shop around for an automobile and you will see how this works. Economists call it `imperfect competition'a tacitly accepted price that is not necessarily the price a stiff competitive free market would create. Only big concerns can swing this sort of competition effectively.
"We do not really know whether bigs make more money because they are efficient or because, through their size, they can `administer' prices." Bigness: Curse or Opportunity? New York Times Magazine, Feb. 18, 1962, pp. 18, 55, 58.
[10] In General Electric the consignee was responsible for lost, damaged or missing items from the stock in his possession and the consignor assumed all risks of fire, flood and obsolescence, while in the instant case the consignee is "responsible to Consignor for all gasolines consigned to him, or for loss thereof or damage thereto from any cause whatsoever other than earthquake, lightning, flood, fire or explosion not caused by his negligence and will pay Consignor for all gasolines sold, lost or damaged."

In General Electric the consignees were, in their regular business, wholesale or retail merchants of other merchandise and some of them had previously so handled the consignor's lamps, while in the instant case the consignees, although some of them had previously been regular retail merchants, deal exclusively in the consignor's gasoline.
General Electric Co. paid "all" taxes assessed on the stock of lamps, whereas Union Oil pays only property taxes.
General Electric Co. carried "whatever insurance is carried" on the stock held by consignees, while Union Oil apparently is not obligated to carry any insurance.
[1] Without commenting on their significance, the Court does purport to discover in the operative provisions of the two agreements factual differences regarding the tax and insurance burdens assumed by the consignors. On closer examination, however, even these purported differences disappear. From the records in the cases, it is clear that both companies assumed the same tax burdenpayment of property taxes on the consigned goods. And since both companies bore virtually the same insurable risks of loss or damage to the goods consigned, the fact that General Electric apparently "carried `whatever insurance is carried' on the stock held by consignees, while Union Oil apparently is not obligated to carry any insurance" is no distinction at all.

The Court implies that the terms of this agreement providing that the consignee must carry personal liability and property damage insurance; that the consignee is responsible for losses of consigned gasoline incurred in the ordinary course of events; and that the consignee must pay his own costs of operation, are inconsistent with a valid consignment agreement. But such provisions are common to consignment agreements. They merely illustrate the well-recognized fact that these retail gasoline dealers are both independent businessmen and agents. A consignee is commonly defined as one who "in the pursuit of an independent calling," is engaged by another as his agent to sell property. See, e. g., Calif. Civil Code § 2026. Consequently, it is not at all surprising for a consignment agreement to provide both that a consignee bear the expenses of conducting his own business, and that he be responsible for loss or damage to the goods occurring in the ordinary course of business. The Court in General Electric explicitly found such provisions unobjectionable, 272 U. S., at 484-485, and further observed that a provision placing the burden of risk of loss or damage to goods on the consignee "is only a reasonable provision to secure [the consignee's] careful handling of the goods entrusted to him." Id., at 484. Nor is the requirement that Simpson carry property damage and personal liability insurance of significance. Such a provision serves the reasonable purpose of protecting the consignor from responsibility (which might be imputed by virtue of the agency relationship) for liabilities incurred by Simpson arising out of or in connection with Simpson's business.
The only remaining point which the Court makes is that the consignee's commission declines as retail prices drop. But it is in the very nature of commissions that they be geared to prices, and it is thus typical of consignment agreements that the consignee bears some of the risk of price declines. In fact, the consignment agreement challenged in the General Electric case provided that "[t]he agent is allowed a compensation of 10% of the list prices of the lamps . . . ." Since the General Electric Company set the list price, it would have been as correct to say in that case, as it is in this one, that the consignee's commission declined as retail prices dropped. Moreover, under Union's agreement, Simpson received a minimum guaranteed commission regardless of the extent of price declines, thereby substantially restricting his exposure to the risks of a decline in the market price.
[2] The quotations in the majority opinion from the General Electric case relate to a wholly separate second issue involved in that case the validity of a license granted by General Electric to Westinghouse, under the patents owned by the former, to manufacture and sell lamps at prices fixed by the patentee-licensorand have no relevance whatsoever to the issue here. Since the source of power over price by the patentee-consignor in General Electric was not his patent, and since the question of patent monopoly is not involved in this case, the patent cases cited by the Court are also singularly irrelevant to the issue here.
[3] There is no reason to suppose that MR. JUSTICE HARLAN will be disqualified in any future case which may involve the question of the continuing validity of the General Electric rule.
[4] The Department's views are not known, because they have not been sought. Indeed, had they been sought, there is a substantial possibility in light of the Department's recognition and tacit validation of consignment selling under the 1959 consent decree entered against the large West Coast oil companies, United States v. Standard Oil Co. of California, 1959 Trade Cases ¶ 69,399, p. 75,522 et seq., that the Government would have taken the position that the rule of General Electric should be left undisturbed.
[5] In that event, the effect of California's Fair Trade Act, Cal. Bus & Prof. Code § 16900, would have to be considered. See 66 Stat. 631, 15 U. S. C. § 45 (McGuire Act).