Richard S. SIMPSON, Appellant,

v.

UNION OIL COMPANY OF CALIFOR-
NIA, Appellee.

No. 17308.

United States Court of Appeals
Ninth Circuit.

Jan. 2, 1963.

Maxwell Keith, San Francisco, Cal., for
appellant.

Brobeck, Phleger & Harrison, Moses
Lasky and Richard Haas, San Francisco,
Cal., for appellee.

Before JERTBERG, and DUNIWAY, Circuit Judges, and JAMES M. CARTER, District Judge.

JAMES M. CARTER, District Judge.

This private antitrust case for damages was decided on motion for summary judgment in favor of appellee, Union Oil Company of California, hereinafter called Union, and against appellant, hereinafter called Simpson. Generally, it raises the issues of (1) interstate commerce, (2) violation of the antitrust laws and liability of Union, and (3) actionable damage suffered by the plaintiff.

We assume for the purpose of this decision, but expressly refrain from deciding, that there were triable issues of price fixing,[1] exclusive dealing,[2] the effect of the McGuire Act,[3] the effect of a prior consent decree of June 1959, whether the consignment program was a device or facade,[4] and inter-state commerce.[5] We refrain from deciding these questions as a matter of law or fact because it appears clearly on the record that Simpson suffered no actionable damage.

### The Undisputed Facts

The following statement of facts which are apparently not in dispute, are taken largely from the statement of the case in the brief of Union.

Union is a producer, refiner and marketer of gasoline. It owns a long term lease on a parcel of land in Fresno, California, improved with a gasoline service station. On May 23, 1956, by written lease, Simpson subleased the station from Union for a term of one year, subject to termination by Simpson (but not by Union) on 30 days notice. In 1957 Union gave Simpson a new one year lease, ending by its express provisions on May 22, 1958. Concurrently with the first lease, Simpson and Union executed a written Retail Dealer Consignment Agreement, terminable by either party at the end of any year and ceasing, under paragraph Eighth, upon any termination of Simpson's right to occupy the station.

In April 1958, Union notified Simpson that it was terminating the consignment agreement at the end of its year and would not offer him a further lease.

May 21, 1958, the day before the end of his term, Simpson brought this action to enjoin Union from taking possession of its property and from leasing the station to anyone else. On June 3, 1958, the court denied the requested relief. The trial court filed an opinion, Simpson v. Union Oil Company, D.C., 162 F.Supp. 746, holding that both the lease and the consignment agreement had expired, and that the court could not compel the making of a new lease.

---

1. See: United States v. Socony-Vacuum Oil Co. (1940), 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

2. See: Sec. 3, Clayton Act, 15 U.S.C. § 14; United States v. Standard Oil Co. (D.C. So.Calif.1948), 78 F.Supp. 850; affirmed Standard Oil Co. of Calif. v. United States (1949), 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371; United States v. Richfield Oil Corp. (D.C.So.Calif.1951), 99 F.Supp. 280; affirmed per curiam, Richfield Oil Corp. v. United States (1952), 343 U.S. 922, 72 S.Ct. 665, 96 L. Ed. 1334.

3. 66 Stat. 632, 15 U.S.C. § 45(a) (2), amendment of July 14, 1952 to Section 5(a) of the Federal Trade Commission Act.
See: United States v. McKesson & Robbins, Inc. (1956), 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209; Business and Professions Code (Calif.) Sections 16905, 17040 and 17045.

4. See: Appalachian Coals, Inc. v. United States (1933), 288 U.S. 344, 360, 53 S.Ct. 471, 77 L.Ed. 825; United States v. Yellow Cab Co. (1947), 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc. (1951), 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219; Timken Roller Bearing Co. v. United States (1951), 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. Masonite Corp. (1942), 316 U.S. 265, 278, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Richfield Oil Corp. (D.C.So.Cal.1951), 99 F.Supp. 280, 289; United States v. Standard Oil Co. (D.C. So.Calif.1948), 78 F.Supp. 850, 859.

5. The question of interstate commerce was merely touched on at pretrial and was not passed upon by the trial court.

Union then sued Simpson in the state court in Fresno for unlawful detainer of the property and obtained judgment, adjudicating that at all times after May 22, 1958, Union was entitled to possession of the service station. Simpson thereupon surrendered possession.

Union moved to dismiss the federal action. The motion was granted, but leave was given Simpson to amend. An amended complaint was filed seeking damages in lieu of equitable relief. After certain pretrial proceedings, Union moved for summary judgment.

Thereafter Simpson himself moved for summary judgment on the issue of liability. Simpson's motion was denied, and Union's was granted. The trial judge filed a memorandum, reported in 1961 Trade Cases, Para. 69,936 p. 77,693.

### Union's consignment method

Prior to 1955, Union's merchandising method was by sale to retailers for resale by them. Union put its "consignment" program into effect in 1955, as a permanent measure. New dealers were taken on only as "consignees", and as rapidly as possible former dealers were converted to "consignees" or their leases not renewed. By the time Simpson sought to be a lessee, "consignment" was the only way in which Union would deal with new lessees.

Under this "consignment" method of marketing, Union purportedly remained the owner of the gasoline, and the "consignee", as its purported agent, sold Union's gasoline. The dealer received a guaranteed commission from Union. Since Union purportedly owned the gasoline and the dealer was merely its purported agent to sell, Union determined the price at which the gasoline was to be sold.

The written consignment agreement provided that Union would deliver to Simpson such quantities of its branded gasolines as the parties *might from time to time mutually agree*; that title to all gasoline delivered would remain in Union until sold by Simpson. Simpson agreed that he would sell "Consignor's gasoline" at prices authorized by it and Union agreed that it would pay Simpson a commission, computed pursuant to a stated formula.

Simpson had been a salaried employee for Union for about eight years, his last position being that of retail representative in the Santa Maria district. He was familiar with the "consignment" agreement and method; he was told by Union he might lease an available Union station and he decided upon a station in Fresno, California. In May of 1956, he secured his first lease, and by renewal his lease ran to May 23, 1958. Apparently until March of 1958 he complied with the terms of the "consignment" agreement and fixed prices accordingly.

On or about March 1958, competitors lowered the price of regular gasoline from 34.9 to 27.9. Union did not permit him to lower his price to 27.9 but insisted he maintain it at 29.9, 2 cents above competition.

Simpson then proceeded to set his own prices for gasoline and from March 1958 to the end of the lease fixed prices without reference to demands or suggestions of Union. He was told that if he did not comply with Union's suggested prices, his lease would not be renewed. Union stipulated in the trial court that when his lease expired it was not renewed because of his violation of the "consignment" agreement and that it was Union's purpose to lease its stations only to "consignees".

### The Amended Complaint

Simpson's amended complaint charged Union with effectuating contracts which unreasonably restrain trade and commerce, and with the intent and an attempt to monopolize the sale of gasoline in violation of the Anti-trust laws. The amended complaint charged price fixing, exclusive dealing and coercion in forcing the consignment program on independent service station operators.

### Plaintiff's Claimed Damage

Simpson claimed damage in the sum of $1000 for his inability to establish his

own retailing prices during the period from May 1955 to March 1958, and claimed damages in the sum of $150,000 alleging he was "unable to obtain a lease from the defendant for a reasonable period of time, was unable to sell or transfer his proprietary interest as lessee to a successor of his own choosing, and was prevented from selling his 'good will' and was prevented from obtaining the fair market value of his business".

## THE STATE OF THE RECORD

The record is not an easy one to read. No written pretrial stipulation of facts was entered into nor was any formal pretrial order made. The trial judge however, filed a memorandum which was helpful.

The Record contains transcripts of proceedings at a pretrial conference on April 30, 1959; a further pretrial conference on May 21, 1959; transcript of proceedings on Union's motion for summary judgment on February 11, 1960; transcript of proceedings on Simpson's motion for pretrial summary judgment on September 16, 1960.

At the pretrial conference on May 21, 1959, the Court suggested that Simpson's counsel submit a statement of the case in factual detail. On June 5, 1959, Simpson filed a "Pretrial Statement for Pretrial Ruling" and an affidavit by Keith, attorney for Simpson, setting forth a series of documents. This statement was before the court on the hearings of the motions on February 11, 1960 and September 19, 1960.

The statement contained the charge that there was an exclusive dealing arrangement, and that lessees were in effect required to buy their gasoline supplies exclusively from the defendant. The statement also charged that the purpose of the defendant in instituting the consignment program was to control the prices at which independent service station dealers could sell their gasoline. However, there was no concession by Union that the pretrial statement was correct.

At these proceedings before the trial court there was considerable discussion about issues and, to say the least, plaintiff's contentions vacillated. Defendant's counsel was pursuing the customary practice in antitrust cases of segmenting the case into parts as small and precise as possible and then attempting to demonstrate there was nothing of merit in each particular part or segment.

The result of all this was to create a most unsatisfactory record in which plaintiff on one date may have indicated he was not seriously pressing a particular contention while at a later date we find the contention being made. Accordingly, in the briefs Union seeks to pin issues down, based upon some statement made in the transcript, and Simpson in the briefs attempts to argue the full extent of his claim, unbound by statements made during the proceedings.

█ If agreement as to facts or issues are reached in the discussions of the pretrial conference, the better practice is to reduce them to writing in the form of a pretrial stipulation and order. As the record now stands, it is almost impossible to determine what agreements, if any, were reached at pretrial.

## DAMAGES

We proceed to the question of damages which is dispositive of this case.

█ It is clear that the private litigant in a suit charging violation of the antitrust laws stands in a different position than the government in an antitrust action. In a government action, there need be present only a violation of the laws and damage to individuals need not be shown. The private litigant must not only show the violation of the antitrust laws, but show also the impact of the violations upon him and damage to him resulting from the violations of the antitrust laws.

If Simpson, assuming solely for this purpose the illegality of the consignment program, suffered no actionable damage, the judgment for Union must be affirmed.

Plaintiff has predicated his case on two items of damage—

(1) failure to secure a renewal of his lease, with $150,000 damage alleged, and

(2) "plaintiff was unable to fix the prices of his gasoline during the period from May 1955 to March 1958, to his injury and damage in the amount of $1000".

## Failure to Secure Renewal of Lease

■■ As to the first item of damage, the facts are not in dispute. Assuming for argument only that the consignment program is illegal, courts may not fashion a new lease for Simpson. Right or wrong, as far as Union's activities are concerned, Simpson's tenure ended on May 22, 1958.

■ We agree with Simpson that a cause of action in a private antitrust suit for treble damages is a tort action, Northwestern Oil Co. v. Socony-Vacuum Oil Co. (7 Cir.1943), 138 F.2d 967 at 970; cert. den. 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081, and is not founded on a contract, and that the fact the contract was terminated, the lease ended and all rights of the plaintiff as lessee in the land came to an end in May 1958, is not an answer to the problem.

Simpson alleges that he was "compelled to accept the one year lease" and "compelled to accept the consignment agreement". His first lease began May 23, 1956, and was renewed for one year to expire on May 22, 1958. He alleges that prior to May of 1955, Union had used a policing method to carry out price fixing. He charges in May 1955 Union created the consignment agreement. He alleges this contract was "forced" on the independent stations by Union.

In determining whether Simpson suffered or could have suffered any damage, it would appear a distinction should be made between the individual such as Simpson, who was entering his first lease with Union in May of 1956, and other individuals who in May of 1956 already were lessees and had been for some time,

i. e., already had status as lessees. Mid-West Theatres Co. v. Co-Operative Theatres, (D.C.E.D.Mich.1941) 43 F.Supp. 216 at 223–224.

Simpson knew that by obtaining the lease he would also have to sign the consignment agreement. He had not previously been a lessee. He had freedom of choice to accept or reject the tendered lease and consignment contract. The record shows that he went into this deal with his eyes open and knew all the facts.

Simpson is therefore not in the position of lessees who had been operating stations under leases from Union and who may or may not have been forced or compelled to sign a consignment agreement as a condition for renewal of their lease. This latter class of individuals had already made an investment in supplies, equipment for their leased stations; had in most cases built up patronage and good will; on the facts in the record might reasonably have anticipated their leases would be renewed from year to year if they performed an adequate job in the service station.

Had Simpson been a member of this class, there might be some merit to his allegations of force and compulsion and his proposed proof of coercion in the acceptance of a renewal lease tied in with the consignment selling program. We do not pass on the question as to these lessees. But Simpson was coming into the leasing business fresh. He had had no former lease agreement.

■ The law does not permit an individual to see and observe a tort violation and then to voluntarily put himself in a position where a tort cause of action would accrue and because of which he might become a litigant.

The Restatement on Torts, Sec. 892, states,

"A person of full capacity who freely and without fraud or mistake manifests to another assent to the conduct of the other is not entitled to maintain an action of tort for harm resulting from such conduct".

■ Courts of law do not award damages to the plaintiff who through his own action has brought the alleged injury upon himself.

It thus appears that any damage occurring to Simpson was the result of his own free and deliberate choice and he could not deliberately and knowingly enter into contractual obligations and then and thereafter contend he was injured by the results of his own acts.

We pass no opinion whether, as a factual matter, dealers in the second category here referred to, i. e., with stations, have been compelled, forced or coerced in their dealings with Union; or if this has happened, what are their rights if any. This decision may await another day with a trier of fact to decide that question.

### Inability to Set Prices

■ What we have said as to Simpson's first specification of damage also applies to his claim of inability to fix prices.

In addition it should be noted that Simpson alleges he was "unable" to fix the price of gasoline from May 1956 to March 1958. The undisputed facts show he did in fact exercise the power or privilege of fixing the prices of gasoline from March 1958 to May 22, 1958. True he did this at the hazard of failing to secure a renewal. The hazard actually eventuated.

The immediate assumption one makes is that he could have pursued this course of action earlier. His action in March 1958 demonstrates he was not "unable" to fix prices on gasoline.

Simpson was apparently content to let the situation rock along until March 1958 before he acted.

■ What he could have earned had he fixed prices on the gasoline from May 1956 to March 1958 is conjectural. Damage in an antitrust case need not be shown to a mathematical certainty. Richfield Oil Corp. v. Karseal Corp. (9 Cir., 1959), 271 F.2d 709. Possibly proof could have been made. But when his claim is based on an alleged *inability* to change the situation and his own actions show this ability we think his claim fails.

### Conclusion

We pass no opinion on the legality of the consignment program.[6] The issue of damages determines this case.

For the reasons stated, the judgment is affirmed.

6. Two consignment cases are pending before the F.T.C.

In F.T.C. v. Sun Oil Co., (1962) Trade Cases, Para. 15,909, an examiner found consignment agreements between Sun and its retail dealers were invalid. The examiner found that the agreements were not primarily to aid the dealers financially as contended, but were entered into "to enable Sun to post uniform lower retail prices throughout the area, increase its share of the market, and attempt to reduce the differential between Sun and the private-brand operators to one cent a gallon". Therefore, there was not a bona fide agency.

As a result of unrealistic tank-wagon prices and leasing arrangements, the examiner found that Sun had economically coerced the dealers into accepting the contracts against their will, although an ostensible choice had been given. The element of coercion was cited as the distinguishing factor between the present case and United States v. General Electric Co. (1926), 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

In Atlantic Refining Co. v. F.T.C., (1962) Trade Cases, Para. 15,786 an examiner found a consignment agreement between Atlantic and its wholesalers, used in meeting a competitive situation, was valid as following the principles of United States v. General Electric Co. (1926), 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

Insufficient evidence of coercion was found to destroy the validity of the agency agreement.