**PERMA LIFE MUFFLERS, INC., et al., Plaintiffs-Appellants,**

v.

**INTERNATIONAL PARTS CORPORATION et al., Defendants-Appellees.**

**No. 15862.**

United States Court of Appeals
Seventh Circuit.

April 25, 1967.

Rehearing Denied June 7, 1967,
en banc.

Cummings, Circuit Judge, dissented in part.

Michael A. Bilandic, Chicago, Ill., Raymond R. Dickey, Robert F. Rolnick, Marshall E. Miller, Washington, D. C., for appellants, Danzansky & Dickey, Washington, D. C., of counsel.

Jay Erens, David Silbert, John T. Chadwell, Glenn W. McGee, David J. Gibbons, Chicago, Ill., for appellees, Chadwell, Keck, Kayser, Ruggles & McLaren, Jacobson, Nierman & Silbert, Chicago, Ill., of counesl.

Before MAJOR, Senior Circuit Judge, and SCHNACKENBERG and CUMMINGS, Circuit Judges.

MAJOR, Senior Circuit Judge.

Plaintiffs brought this action in a three-count complaint for the recovery of damages allegedly sustained by reason of defendants' violation of the antitrust laws of the United States. They alleged in counts 1 and 2 that the terms of certain franchise agreements executed by the parties to govern their relationship in the purchase and sale of automotive exhaust systems parts through establishments displaying defendants' trade and service marks, "Midas" and "Midas Muffler Shop," illegally restricted plaintiffs in the operation of said shops. They alleged that the corporate and individual defendants joined in an illegal conspiracy to restrain trade, in violation of Sec. 1 of the Sherman Act (Sec. 1, Title 15 U.S. C.A.), and that they violated Sec. 3 of the Clayton Act (Sec. 14, Title 15 U.S. C.A.). They alleged in count 3 that the defendants violated Sec. 2 of the Clayton Act, as amended by the Robinson-Patman Act (Sec. 13, Title 15 U.S.C.A.), by granting discrimination in price and service to certain of their customers without offering or otherwise making available these same prices and services to plaintiffs.

The District Court, on a voluminous record and after numerous protracted hearings, sustained defendants' motion for summary judgment as to all counts. In its order entered May 24, 1966, from which the appeal comes, the Court held (1) that plaintiffs were in *pari delicto* and, therefore, without standing to complain about violations of Sec. 1 of the Sherman Act and Sec. 3 of the Clayton Act, and (2) that defendants' price and service discrimination did not constitute a violation of the Clayton Act, as amended by the Robinson-Patman Act.

Of the multiple plaintiffs, only four, Gregory Skarupa, Maxwell Ross, Joseph Pierce and Claude Wheeler, are here as appellants. Each of the plaintiffs, as well as others, was licensed under a franchise agreement with defendants to use the trade name, trademarks and service marks identified as "Midas" and "Midas Muffler Shops," in businesses which they operated in various states. Each plaintiff voluntarily entered into his first franchise agreement, and subsequently each sought and obtained franchises for additional shops.

The defendants were International Parts Corporation, three of its subsidiary corporations, plus six individual officers or agents of the corporate defendants. These ten separate legal persons constituted a single trading entity by which Nathan Sherman and his son, Gordon Sherman, conducted their family-owned business, including the sale of automobile exhaust systems.

In support of their motion for summary judgment, defendants presented to the District Court a 9-page detailed affidavit of the two Shermans, defendants and chief executive officers of the corporate defendants, and a 31-page appendix of excerpts from plaintiffs' depositions, answers to interrogatories or other record sources. Neither the affidavit nor the contents of the appendix was challenged by the plaintiffs in the court below by counter-affidavits. Plaintiffs relied upon documentary proof, their deposition testimony and defendants' answers to interrogatories.

Judge Abraham L. Marovitz in a memorandum opinion, after a meticulous analysis of the factual situation and the case law, with reference to counts 1 and 2 stated:

"It is clear from the undisputed facts before us that each plaintiff voluntarily entered into the franchise agreement at issue and accepted the benefits therefrom. They are, under the holdings in Rayco [Rayco Manufacturing Company v. Dunn, D.C., 234 F.Supp. 593] and Crest [Crest Auto Supplies, Inc. v. Ero Manufacturing Co., D.C., 246 F.Supp. 224] *in pari delicto* with defendants, and therefore unable to reap the harvest of their own misdeeds. Each plaintiff recognized that the franchise conveyed to him the right to use the various Midas trade names, trademarks and service marks, and each profited from the use of same. They are not now entitled to the high profit of a treble damage suit when they vol-

untarily acceded to, fostered, and profited from the very practice about which they now complain."

Subsequent to the entry of the judgment in the instant case, *Crest* was affirmed by this Court. Crest Auto Supplies, Inc. v. Ero Mfg. Co., 360 F.2d 896.

In allowing defendants' motion for summary judgment on count 3 of the complaint, the District Court concluded:

" * * * that any alleged difference in price or service between purchases by plaintiff of Midas brand exhaust parts and purchases by other persons of Midas or International brand parts from defendant did not constitute a discrimination violative of the Robinson-Patman Act, in that (a) plaintiffs did not compete with other purchasers of Midas brand parts; (b) plaintiffs had the opportunity to purchase either brand; and (c) the Midas exhaust parts system was unlike the International system in grade and quality."

We think the Midas history, taken in the main from the unchallenged affidavits of Nathan and Gordon Sherman, is relevant. International Parts and the other defendants composed the single business entity by which the Sherman family sold exhaust parts. Prior to the Midas franchise plan, which defendants originated in 1955, exhaust system parts were sold to consumers from innumerable retail outlets, such as garages and service stations. A muffler was merchandised like most other automotive replacement parts, was given no special attention, enjoyed no consumer brand consciousness and required a labor charge for installation. All of this was changed by the introduction of Midas, with its nationally advertised trade names, nationwide chain of specialized exhaust system shops, unique guarantee and free installation.

A network of franchised dealers, each of whom purchased directly from International Parts and owned a retail outlet identified by the various "Midas" trade names and service marks, invited the public to a nationwide chain of automotive shops specializing in exhaust system parts. The dingy surroundings of the typical auto repair shop were replaced by the Midas atmosphere of cleanliness, comfort and prompt, courteous service. The guarantee of a new Midas muffler free to replace any that wore out as long as the customer owned the car was to be honored in each shop no matter where the first muffler was purchased.

Success for this new merchandising concept, and for each Midas dealer, necessitated that the American motorist recognize the Midas name and have confidence that each dealer was an exhaust specialist who handled the same quality product, provided the same clean and comfortable surroundings, gave the same prompt and dependable service and honored the same unique Midas guarantee. Millions were spent by defendants and the Midas dealers on national and local advertising to publicize this Midas story.

A franchise agreement was tendered to each prospective dealer. It required no franchise fee, construction expense or purchase of capital equipment from defendants, and it was cancellable by either party on 30 days' notice. No lease of real estate or other equipment from Midas was required; the franchise was a contract for the purchase of Midas products for resale from a retail outlet licensed by defendants to use the trademark "Midas" and the service mark "Midas Muffler Shop." Unlike the traditional auto repair shops that purchased through middlemen, the Midas dealers purchased at a significantly lower cost directly from International Parts.

A national association of Midas dealers and a monthly magazine allowed each dealer to learn about and profit from the experiences of his fellow dealers and to visualize better the national Midas image. Select dealers, including plaintiffs, who were most interested in this image and who had attained the greatest success, were members of a dealers' National Advisory Council. International Parts employees, called Midas field counselors, were used to assist the dealers.

After obtaining their first Midas franchise agreement most dealers, including plaintiffs, subsequently opened additional

shops. Virtually every dealer, particularly plaintiffs, enjoyed substantial monetary gains from participation in the Midas program.

The gist of plaintiffs' argument appears to be embodied in the following statement taken from their brief:

"Appellants operated under their agreements with appellees retailing and installing the Midas mufflers from 1955–56 to 1959–60. During this period appellees sold appellants the Midas muffler with its lifetime guarantee. In return appellees required appellants to retail the muffler at prices fixed by appellees and to honor muffler guarantees on presentation. Appellants were also required to deal exclusively with appellees. To purchase the Midas muffler, appellants were required to purchase all other exhaust parts items from appellees. At the same time appellees refused to sell appellants or permit them to handle the International muffler (which also carried a lifetime guarantee) or any automobile parts other than automotive exhaust systems parts. Moreover, appellees also refused to allow appellants to purchase from any of appellees' competitors."

So far as we are able to discern, no claim is or ever has been made by plaintiffs that any restriction was imposed by defendants other than those provided in the franchise agreements.

Plaintiffs in their reply brief, apparently in recognition of the damaging effect of the undisputed testimony of the great benefit and profits which they derived from the Midas program, narrow the issue considerably. They characterize defendants' argument in this respect as "spurious." The brief states:

"The practices about which the appellants complain are appellees' exclusive dealing and resale price maintenance practices, and not, as appellees suggest, the program as a whole. Appellants were required to pay more for exhaust system parts which they purchased from the appellees than they would have paid had they been free to purchase these same parts from competitors of the appellees. This is the practice about which the appellants complain. It is difficult to imagine how appellants could have profited from such a practice."

Assuming there is any factual basis for this assertion, which is disputed, restrictions about which they complain were contained in the franchise agreement to which each of the plaintiffs solemnly subscribed.

The four plaintiffs operated in separate areas of the nation, were previously unacquainted with each other, and all participated in the Midas program in a similar manner. Each of the twenty shops operated by plaintiffs bore the name, "Midas Muffler Shop," and displayed Midas advertising material. National advertising by defendants covered plaintiffs' markets and was supplemented by plaintiffs' local advertising.[1] Each of the plaintiffs was at one time a member of the National Advisory Council. Plaintiffs Skarupa, Ross and Wheeler on 30 or 60 days' notice abandoned the Midas program, as permitted under the franchise agreement, and entered the Robin Hood program.[2] Pierce's franchise was terminated by Midas, on an agreeable basis, and he entered the Robin Hood program.

The deposition testimony of each of the plaintiffs is highly significant and, standing alone, completely refutes any notion that their participation in the Midas program was other than on a voluntary basis, or that they were coerced in

1. The national advertising expenditure by defendants from 1956 through 1960 was $3,570,424. Advertising was in numerous national magazines, as well as by radio and television programs. Much of the latter was done over stations in the areas in which plaintiffs operated.

2. The Robin Hood franchise program was sponsored by a competitor of International Parts Corporation. Its dealers sold items other than exhaust systems and there was no manufacturer's guarantee on the featured muffler.

pursuing a course which they now claim was illegal and for which damages are sought. A brief resumé of such testimony will suffice.

Skarupa in 1955, while employed by the Veterans Administration, sought defendants' guidance in opening a muffler shop in the Washington, D. C. area. He was so enthusiastic about the prospect that he organized Perma Life Mufflers, Inc., and on April 10, 1956, was granted his first Midas franchise. He testified, "I was interested in the Midas program provided I got assurances that the Washington metropolitan area would be assigned to me so that if I developed it I could reap the benefits of such development." Skarupa executed three more Midas franchise agreements within two years, and then terminated his four franchises because he could not obtain franchises for three more Midas shops he wanted to open. He mainly complained that he was limited in his further expansion in the Midas program. He wanted to monopolize and profit from every possible Midas shop in the Washington area. When defendants refused his request in this respect, he terminated his Midas franchise and joined the Robin Hood program. Skarupa's profit during the years he participated in the Midas program was $200,000. In the present action, he seeks an additional $800,000 in damages suffered as a result of the alleged ill treatment accorded him by defendants. He also seeks damages in the amount of $60,000 per year because of defendants' refusal to grant him three additional franchises.[3]

Ross became a highly paid executive of a profitable chain of four Midas shops in Michigan. He wanted the Midas image, the guarantee, the advertising and the quick service. He recognized that merchandising exhaust parts by national advertising was originated by Midas and that by his participation in the Midas system his business gained a valuable image of substance and credibility. To Ross, the franchise "meant that I thought that this was a good idea. I thought that it was a way of making some real money if I got into it quickly. * * * The thing that excited me was the guarantee * * *," and was "an avenue for sales and profit for me." He was so well satisfied with the program that he acquired two additional franchises for shops in Minneapolis for the reason, "Well, I had a good measure of success in the Muskegon and Grand Rapid areas. I liked the program. It was making money for me. I wanted to get in a larger metropolitan area, and Minnesota was open. I wanted not only the Minneapolis [area] but [also] St. Paul." He offered to construct a new building to house a Midas shop, if granted another franchise. He continued under the Midas program until offered what he thought was the less restrictive Robin Hood franchise, and then terminated his franchises with Midas.

Pierce was operating three muffler shops in upstate New York when he learned about the Midas program, for which he sought and was granted franchises. Within one year he obtained three more franchises, giving him a chain of six Midas outlets in five cities. He organized and did business under three corporate names, Muffler Sales and Service, Inc., Midas Muffler Sales and Service, Inc., and Pierce Muffler Shops, Inc. He was so well satisfied with the program that he attempted to obtain a franchise for a friend. Some controversy arose between Pierce and defendants, and his franchises were cancelled by defendants, without objection by Pierce.

Wheeler, located in the St. Louis area, learned of the Midas program through an advertisement and requested a franchise, which was granted. He sought more franchises so that he could preclude pro-

---

3. Skarupa's answer to Interrogatory II: "Plaintiffs were not permitted to satisfy the demand for additional muffler shops in the Washington Metropolitan Area. Had they been permitted to, plaintiffs would have opened three additional shops which would have had additional sales of approximately $100,000.00 per year each, or a total additional sales of approximately $300,000.00 per year. Net profit would have averaged 20% per year. Damages: $60,000.00 per year."

spective Midas dealers from entering the St. Louis area. Within twelve months of opening his first shop, he had signed two more franchise agreements. Wheeler terminated his franchises and joined Robin Hood because defendants would not give him exclusive rights in the St. Louis area.

Plaintiffs' radio, television and newspaper advertisements demonstrate their participation in and cooperation with the defendants in the programs of which they now complain. In the sake of brevity, we refer only to those by Skarupa which are typical of the advertising of all plaintiffs:

"Member America's Only Coast-to-Coast Network of Exclusive Auto Muffler Shops."

" * * * we're specialists in just one thing—your car's exhaust system * * *."

"ANNOUNCING! The Newest Member of The Great National Network of Midas Muffler Shops."

"Look for the MIDAS Sign—America's only coast-to-coast network of exclusive auto muffler shops."

" * * * visit any one of Washington's three MIDAS MUFFLER SHOPS. Famous MIDAS mufflers come to you * * * installed FREE within fifteen minutes, while you watch * * * with a written guarantee from the factory for the lifetime of your car. It's a guarantee that follows you around the United States, to more than 200 cities bearing the MIDAS MUFFLER SHOPS sign * * *."

" * * * MIDAS dual exhaust specialists will convert your present single exhaust system to a dual, in practically no time at all. You see, MIDAS exhaust experts perform in minutes the work ordinary garages and dealers take hours to do * * *."

After reviewing plaintiffs' testimony, the District Court stated, "Under no circumstances could 'coercion' be said to have been a factor herein." We think that conclusion is inescapable. Moreover,

their testimony supports the Court's finding, "They voluntarily acceded to, fostered, and profited from the very practice about which they now complain."

In support of their argument that the *pari delicto* defense is not available to antitrust defendants, plaintiffs on brief rely heavily upon and discuss at great length Simpson v. Union Oil Co. of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L. Ed.2d 98, reversing 9 Cir., 311 F.2d 764. They argue that *Simpson* "is dispositive of the *pari delicto* issue in this case." We have read and reread this opinion, and do not agree. The Court does not mention *pari delicto* and we think it did not intend to annihilate a principle so long embedded in the law.

It appears that the hard core basis for the Court's decision resides in the fact that Union Oil was in a position by means of a lease to coerce Simpson to sell at prices fixed by Union Oil. Simpson was a retail dealer and leased from Union Oil the premises on which he did business. At the same time, he executed a consignment agreement with Union Oil. Both the lease and the agreement were terminable by either party at the end of any year, and the consignment agreement by its terms ended upon cancellation of the lease. As to this arrangement the Court stated (377 U.S. page 21, 84 S.Ct. page 1057):

"By reason of the lease and 'consignment' agreement dealers are coercively laced into an arrangement under which their supplier is able to impose noncompetitive prices on thousands of persons whose prices otherwise might be competitive."

When Simpson refused to comply with the terms of the consignment agreement, Union Oil cancelled his lease. By this action Simpson was deprived not only of the right to purchase from Union Oil but simultaneously of a place to do business. The Court concluded its opinion by stating (377 U.S. page 24, 84 S.Ct. page 1058):

"We intimate no views on any other issue; we hold only that resale price maintenance through the present, coer-

cive type of 'consignment' agreement is illegal under the antitrust laws, and that petitioner suffered actionable wrong or damage."

Without restating the facts of the instant case, it is sufficient to note that they are a far cry from those considered by the Supreme Court in *Simpson*.[4]

Plaintiffs on brief argue that the decision here under attack is not only contrary to the decision of the Supreme Court in *Simpson* "but also contrary to the substantial weight of authority." We think the weight of authority is in the opposite direction. However, we see no point in citing or discussing plaintiffs' cases on this score inasmuch as in our recent decision in *Crest* (360 F.2d 896) we considered the same contention and in the main the same cases as are relied on here. In *Crest* we stated (page 900):

> "Plaintiffs refer to a 'feeling' in 'all the Courts' against the pari delicto rule in private anti-trust cases. The only animus we detect in the courts on the pari delicto question is directed at protecting those who are coerced into illegal agreements * * * [citing cases], or at permitting suits where the defense is the unclean hands of a plaintiff in transactions other than the one in suit, as the Supreme Court held in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219 (1951). But where a plaintiff participates freely in the alleged anti-trust conduct, the pari delicto rule precludes recovery. [Citing many cases.] As Judge Soper said in Pennsylvania Water, (Pennsylvania Water & Power Co. v. Consolidated Gas Electric Light & Power Co., 4 Cir.), 209 F.2d 131, at 134, the doctrine that a plaintiff who is a voluntary party to the allegedly illegal agreement which forms the basis for the antitrust suit cannot recover thereon was

'firmly established in earlier cases,' and still remains to be given effect in appropriate actions."

Plaintiffs on brief assert that the *Pennsylvania Water* decision cited and quoted from by this Court in *Crest* "was inferentially overruled" by the same Circuit in its subsequent decision in Osborn v. Sinclair Refining Co., 4 Cir., 286 F.2d 832, cert. denied 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255. We think in this plaintiffs are mistaken. In *Osborn*, there was no written franchise contract agreement or other form of arrangement by which the plaintiff obligated himself to be bound. More than that, the Court found that the grievance of which plaintiff complained was the result of coercion. No *pari delicto* defense was involved and, obviously, the Court did not overrule its previous decision in *Pennsylvania Water*.

Plaintiffs' reliance upon Bales et al. v. The Kansas City Star Company et al., 8 Cir., 336 F.2d 439, is even more pointedly misplaced. In that case the Eighth Circuit, in a decision rendered five months after that of the Supreme Court in Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, gave recognition to the doctrine of *pari delicto* as a defense. The Court stated (336 F.2d page 444):

> "Of course, if the plaintiffs actually were in pari delicto with the defendants in the alleged endeavor of the Star to prevent competition and create a monopoly for itself in the area, the law should leave them where it finds them. But if they accepted the contract restriction only in business necessity and not in any sanction or furtherance of a trust endeavor by the Star, they would not be in pari delicto for purposes of the right to recover for such provable injury to their businesses as the Star's antitrust violation had occa-

---

4. It is significant that *Simpson*, decided by the Supreme Court more than two years prior to our decision in *Crest*, was not relied upon, not even cited, by the parties in *Crest*, either in the District Court or in this Court. *Simpson* was also not relied upon by either party in Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Association, 7 Cir., 371 F.2d 263, 267, in which we reaffirmed the *Crest* rule.

sioned." (Citing numerous cases, most of which we cited in Crest.)

■ In résumé, each plaintiff initially asked to become a participant in the Midas merchandising program and voluntarily, willingly and knowingly executed his first Midas franchise agreement. Each plaintiff thereafter eagerly sought additional shops in the Midas program and voluntarily executed additional franchise agreements for such shops. Each plaintiff at all times had the legal right to abandon the Midas program and to cancel these franchise agreements on 30 days' written notice. Three of the instant plaintiffs unilaterally terminated their franchises when it suited their convenience and the fourth acquiesced in the termination of his franchise. Furthermore, each plaintiff cooperated with defendants and all other Midas dealers in the conduct which plaintiffs now assert was illegal and injurious to their business and property. Each plaintiff accepted the benefits arising out of the franchise agreements and earned substantial and significant profits during the terms of such agreements. Each plaintiff sought to perpetuate the "wrong" of which he now complains by acquiring additional franchises, and Skarupa makes the contradictory claim that he is entitled to damages not only because of the "wrong" he suffered while a party to and operating under franchise agreements but also because additional franchises which he sought were denied. Presumably, he was so well satisfied with the ill treatment which defendants assertedly imposed upon him that he sought the opportunity to suffer more of the same treatment.

It would be difficult to visualize a case more appropriate for the application of the *pari delicto* doctrine. We hold that it was properly applied and given effect by the District Court.

■ The District Court further held as an alternative basis for the dismissal of count 1 of the complaint that no conspiracy existed as a matter of law. The Court found that the corporate and individual defendants were a single business entity through which a family business was operated. Based on this factual premise, with which plaintiffs take no issue, the Court, citing Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 5 Cir., 200 F.2d 911, 914, held as a matter of law that no conspiracy as alleged in the complaint existed. At the same time the Court recognized, "While we agree with plaintiff that subsidiary corporations may under certain circumstances 'conspire' to violate the antitrust laws, the record before us indicates by uncontested facts that no such conspiracy was present here."

Plaintiffs in support of their argument on this point rely upon Kiefer-Stewart Co. v. Seagram & Sons, Inc. et al., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, which they claim involved the same type of conspiracy as that alleged here. In that case, while it appears there was common ownership and control of the corporate defendants, there was no finding such as we have where all the defendants were acting as a single business entity. As the District Court stated:

"There is no evidence, except in plaintiffs' unsupported arguments that these corporations competed with each other or acted in any manner other than as a single integrated business. There are no acts alleged which could not have been done by a single corporation acting alone. Plaintiffs may not by mere pleading allegations and conclusions fragmentize a unified business to meet the conspiracy requirements of the Sherman Act."

We agree with the reasoning and hold that count 1 was properly dismissed on this alternative basis.

Defendants argue as a further defense that the Midas franchise agreements, and the merchandising methods employed by plaintiffs, defendants and the other Midas dealers in connection therewith, were reasonable and legal means to protect the various Midas trade names, trademarks and service marks licensed to plaintiffs by such franchise agreements, and that such agreements and merchandising methods were not prohibited by the Sherman or Clayton Acts. As

plaintiffs point out, at one stage of the proceedings this defense was on their motion stricken. Defendants contend that subsequently the defense was reinstated and may be relied upon here. On this score the record abounds with confusion. One thing, however, emerges with certainty, that is, that the District Court did not rule on the merits of this defense and, therefore, did not rely upon it in allowing defendants' motion for summary judgment on counts 1 and 2. In view of our agreement with the District Court as to the other grounds upon which the motion for summary judgment was allowed, we, like that Court, find no occasion to decide defendants' contention in this respect.

We now come to count 3, which charges defendants with the violation of Sec. 2 of the Clayton Act, as amended by the Robinson-Patman Act (Sec. 13, Title 15 U.S.C.A.), by price and service discrimination against plaintiffs and in favor of other customers.

Defendants' motion for summary judgment as to this count stated:

"Any difference in price or service, as alleged in Count Three, between purchases by plaintiff of Midas brand exhaust parts and purchases by other persons of Midas brand exhaust parts or International brand exhaust parts from defendants did not constitute a discrimination, in that:

(a) Plaintiffs did not compete with other purchasers of Midas brand exhaust parts;

(b) Plaintiffs had the ability and opportunity to purchase Midas brand exhaust parts or to purchase International brand exhaust parts;

(c) Retailers' and consumers' preference for the Midas brand exhaust parts system as a premium commodity, its inseparable and distinct guarantee, and its different metallic properties made it unlike in grade and quality to the International brand exhaust system."

The District Court at the time it allowed summary judgment as to counts 1 and 2 denied such judgment as to count 3, without prejudice to the right of plaintiffs to obtain defendants' answers to certain interrogatories which they had proposed. After defendants had supplied the information thus sought, the Court allowed summary judgment as to this count.

■ We reach the conclusion that the allowance of summary judgment as to count 3 was improper. In doing so, we see no point in citing or discussing the numerous cases called to our attention. It is sufficient to refer to two recent decisions of this Court, cited and relied upon by defendants. Crest Auto Supplies, Inc. v. Ero Mfg. Co., 7 Cir., 360 F.2d 896; Markwell v. General Tire and Rubber Co., 7 Cir., 367 F.2d 748. In both cases summary judgments were affirmed. In *Crest,* as previously shown, the situation was similar to that here. In that case we affirmed summary judgment as to counts 1 and 2, based on the *pari delicto* defense. We affirmed summary judgment as to count 3, in the main for the reason that the complaint failed to allege that the practice complained of had any effect on competition. We also held that the affidavit filed in support of the motion was not controverted by counter-affidavit and there was thus no issue of material fact.

In *Markwell,* we sustained summary judgment on the premise that affidavits filed by the plaintiff in response to the motion for summary judgment failed to contradict those filed in support of the motion. In doing so we stated (367 F.2d page 750):

"As the Supreme Court's Advisory Committee stated, Rule 56(e) was amended to require a party opposing a motion for summary judgment, supported by affidavits, to produce enough evidentiary matter to establish a genuine issue for trial, for the 'very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' "

The situation in the instant case is far different. The sole affidavit offered by defendants in support of summary judg-

ment was, as previously noted, that of Nathan and Gordon Sherman. While this affidavit was pertinent to the defense of *pari delicto* interposed as to counts 1 and 2, it bears no relevancy to the count under consideration. It neither denies nor offers any explanation as to the discriminatory practices alleged in count 3. Obviously, it required no counter-affidavit. More than that, the voluminous record here contains deposition testimony, answers to interrogatories and much documentary evidence, from which we think clearly emerge genuine issues for trial.

The District Court held that there was no intra-brand discrimination, that is, sale of Midas parts to other Midas dealers at prices lower than those charged plaintiffs, on the ground that such parties were not in competition. However, the Court's finding that there was no competition among such dealers is based solely upon plaintiffs' deposition testimony "that the geographic 'marketing area' in which they sold Midas products was the 'city or county' in which each shop was located, and that no other Midas dealer was located within that region of competition." This geographical situation, while a factor to be considered, in our view does not eliminate the issue as to whether there was or might have been competition. Customers of Midas dealers might be located in areas between dealers and willing to patronize any of them.

More important, the Court embraced defendants' contention that there was no legal discrimination against plaintiffs because they had the ability and opportunity to purchase either Midas brand exhaust parts or International brand exhaust parts (inter-brand). Relative thereto, the Court found:

"* * * that plaintiffs, well aware of any price differentials that might exist between the two brands, having dealt with International previously, and in one instance having continued to do so, *freely* chose to forego purchases of International parts and to deal exclusively with Midas. * * *

The evidence is uncontroverted in demonstrating that plaintiffs were free to purchase either product, but chose Midas. No discrimination in a legal sense is present, and defendants are entitled to summary judgment."

We think this finding confuses the issue presented by count 3 with that which we have previously considered relative to counts 1 and 2. True, plaintiffs by their franchise agreement *"freely* chose to forego purchases of International parts and to deal exclusively with Midas." Thus, under the *pari delicto* doctrine, as we have held, they were precluded from complaining on that score. However, the fact that they were required to purchase from Midas at a price determined by it does not absolve Midas from the charge that it or International granted discriminations in prices and services to certain of their customers, without offering or otherwise making those same or similar services available to plaintiffs, as charged in count 3.

We think the finding, "The evidence is uncontroverted in demonstrating that plaintiffs were free to purchase either product, but chose Midas," is erroneous. Plaintiffs' freedom in this respect was forfeited by the terms of the franchise agreements. The record contains much evidence that there was a continuing effort on the part of Midas to enforce the exclusive dealer requirement.

A few excerpts from the record are sufficient to demonstrate at least that there was an issue as to whether plaintiffs were free to handle any product other than that purchased from Midas. On July 1, 1957, Gordon Sherman advised his "field counselors":

"THE MOST SACRED PRINCIPLE OF THE MIDAS PROGRAM IS THAT ALL MIDAS SHOPS ARE MUFFLER SPECIALISTS, AND NO SIDE LINES ARE PERMITTED IN SHOPS THAT IDENTIFY THEMSELVES WITH THE MIDAS PROGRAM.

* * *

"* * * any merchandise not carrying the Midas brand. Our policy in

this matter is simply one of requiring that those people who are part of the program are part of it all the way. * * * See to it that it is enforced and tell us where it isn't."

On March 31, 1958, Sherman in a memorandum to all "field counselors" stated in part:

"We now require that all Midas Muffler Shops purchase their Hollywood mufflers from Midas exclusively. This is somewhat overdue since the convention last year, and we have long since prepared our dealers to accept this line as part of their overall participation in the Midas program. Take it from there."

On March 25, 1959, Sherman advised his "field counselors" that the home office had "studied each and every Midas order" as it was processed for shipment in order to "isolate" those dealers who were not purchasing "tail pipes" from defendants. In this memorandum Sherman reiterated defendants' exclusive dealing policy, stating:

"When a dealer signs a franchise with us he commits himself undeniably to certain basic practices in our program. Paramount among these is his consistent and exclusive purchase of our products. Our dealers have become so dedicated to our mufflers that I believe there is no question on this, but it is possible that some of them regard our tail pipes and our clamps as a kind of afterthought to which 'loyalty' does not apply. You have all been aware of this as you also have been aware of certain tail pipe companies who manufacture short lines of easily produced numbers at discount prices."

The deposition testimony of plaintiffs as well as their answers to interrogatories likewise raise an issue as to their freedom to purchase products other than Midas. Typical is the testimony of Skarupa as to a conversation with a "field counselor":

"Q. Do you recall the substance of that conversation?

A. Well, I had pointed out to him that I could buy pipes cheaper if I bought through Texas Tailpipe. I could save a considerable amount of money. I could save a considerable amount of money in the year's purchase.

Q. What was his reply?

A. Well, he explained to me that I should know by now that I wouldn't be able to purchase from outside sources because of the fact that I would get my franchise cancelled and he explained to me that others had their franchise cancelled from the purchase of outside products."

Further in response to defendants' motion for summary judgment, the District Court stated:

"Finally, we are convinced that the Midas parts were sufficiently dissimilar in grade and quality from International products so as to justify a price differential under the terms of Section 2(a)."

In our view, this is another issue which cannot properly be determined on a motion for summary judgment. Certainly the Court's reference to "Midas parts" could not refer to items other than mufflers. There is evidence that tail pipes, exhaust pipes, clamps and other items sold by Midas were indistinguishable from similar items sold by International and by other parties. In fact, Gordon Sherman in his deposition admitted that exhaust pipes, tail pipes and clamps sold by Midas did not bear a trademark or trade name. Defendant Schroeder on interrogatory admitted as much:

"Q. Was the Midas name placed on any of these items by putting the item in a box with a Midas name on it or by attaching a tag with a piece of wire or string during any of the period 1955 through and including 1960?

A. Not to my knowledge."

Plaintiff Ross on deposition testified:

"We could see no purpose, really, in buying pipes of that kind from Midas. There was no quantity discount.

There was no freight allowance except the freight allowance when we shipped in larger quantity. Then we got a lower rate.

"There was no insignia on the pipe. Certainly we wouldn't be confusing anybody by selling a pipe from Texas rather than a pipe sold to us by Midas."

Plaintiff Skarupa testified:

"A. I don't think we can ascribe the word 'Midas' to the tailpipes because they weren't identified as such and people didn't come in asking for Midas tailpipes. There was no guaranty on the tailpipes.

Q. They were not identified as 'Midas' on the boxes were they not?

A. No sir.

Q. They were not?

A. Sir?

Q. They were not?

A. Midas tailpipes were not identified as Midas tailpipes, as you are stating it.

Q. On the boxes in which they were shipped?

A. The tailpipes didn't come in boxes; they came in bundles.

Q. There was no identification of 'Midas' or anything on the bundles?

A. A packing slip which was tied with wire, but that wasn't affixed to the tailpipes."

The District Court further stated:

"In addition to an undisputed physical difference existing between the two mufflers after January 1, 1959, the uncontroverted facts clearly reveal that the Midas product included in its purchase price a unique lifetime guarantee by the manufacturer, not attached to the International commodity. Such a guarantee, in the opinion of this Court, clearly justifies a differential in price, and with equal clarity, constitutes a dissimilarity in grade and quality."

This reasoning in part is beside the point. The physical difference in the two mufflers, after January 1, 1959, is immaterial. Plaintiffs on brief make this clear. They state:

"After January 1, 1959, International Parts changed the gauge of steel used in the manufacture of the Midas muffler. Appellees used this change to justify the differential in their guarantee. Appellants' claim, however, is not based on the post-1959 muffler; rather, appellants' claim is based solely on the pre-1959 mufflers which were returned after January 1, 1959, and which were identical to mufflers returned by their competitors who received a rebate of 100%; appellants received a rebate of only 50%."

There is evidence that there was no physical difference between the mufflers sold by International and those sold by Midas, except for the identification brand, for the years 1955 to 1959, inclusive. This was admitted in the deposition testimony of defendant Schroeder.

It is undisputed, as the District Court points out, that the Midas muffler carried a guarantee good at any Midas muffler dealer wherever located, while the International muffler carried a guarantee good only where purchased. We do not agree, however, that this difference constitutes a "dissimilarity in grade and quality" or that it justifies a difference in price.

We think the rationale employed in Federal Trade Commission v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153, is applicable. The Court held, as stated in a headnote (383 U.S. page 637, 86 S.Ct. 1092):

"Labels do not differentiate products for the purpose of determining grade or quality under Sec. 2(a) of the Act, even though one label may have more customer appeal and command a higher price in the marketplace."

Paraphrasing this language, the Midas trade name or trademark does not differentiate its mufflers for the purpose of determining grade or quality, even though its guarantee may have more customer appeal and command a higher price in the marketplace.

Nothing we have said is to be taken as a resolution of any issue of fact. Our sketchy review of the evidence is only for the purpose of showing that there are genuine issues of fact which preclude the disposition of count 3 by summary judgment.

The summary judgment as it relates to counts 1 and 2 of the complaint is affirmed. The summary judgment as to count 3 is reversed and the cause therein stated is remanded for further proceedings.

Affirmed in part and reversed in part.

CUMMINGS, Circuit Judge (dissenting in part).

I agree with the majority that Crest Auto Supplies, Inc. v. Ero Manufacturing Company, 360 F.2d 896 (7th Cir. 1966) supports the *in pari delicto* defense to Counts 1 and 2. However, an examination of the briefs filed in *Crest* reveals that Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, was not cited to this Court. A close study of the *Simpson* case, including the briefs filed therein, convinces me that the Supreme Court would not accept the *in pari delicto* defense here. As with these plaintiffs, Simpson had freedom of choice "to accept or reject the tendered lease and consignment contract. The record shows that he went into this deal with his eyes open and knew all the facts." He "deliberately and knowingly enter[ed] into [the] contractual obligations * * *." (311 F.2d 764, 768, 769.) In *Simpson*, the Ninth Circuit used the *in pari delicto* theory to deny him any recovery. That point was fully briefed in the Supreme Court, which re-versed, permitting Simpson to prevail. Therefore, I am forced to conclude that the Supreme Court rejected the *in pari delicto* defense. Judge McLean came to the same conclusion in Lyons v. Westinghouse Electric Corporation, 235 F.Supp. 526, 537 (S.D.N.Y.1964), stating:

"It may be noted that under Simpson v. Union Oil Co., supra, the fact that plaintiffs voluntarily entered into an illegal contract does not in itself bar their recovery. The contract, if illegal, is still an actionable wrong." [1]

In *Simpson*, even Mr. Justice Stewart's dissent agreed that the *in pari delicto* reasoning of the Ninth Circuit was "untenable" (377 U.S. at p. 25, 84 S.Ct. 1051). As in *Simpson*, these defendants had the coercive power to terminate plaintiffs' franchises if plaintiffs did not adhere to the resale price maintenance and exclusive dealing provisions. These plaintiffs wished to buy various parts (tailpipes, clamps, etc.) from competitors of Midas who were selling at lower prices than Midas. If they had been permitted to purchase at these lower prices, they would have been able to lower their prices, as did Simpson.

As stated in *Simpson* (377 U.S. at pp. 16, 17, 18, 84 S.Ct. at p. 1054):

"The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws.

\* \* \* \* \* \*

"The exclusive requirements contracts struck down in Standard Oil Co. v. United States, 337 U.S. 293, [69 S.Ct. 1051, 93 L.Ed. 1371,] were not saved because dealers need not have agreed

1. Professor Day interprets the *Simpson* case in accordance with Judge McLean's opinion. See 25 ABA Antitrust Section 240 (1964). Other cases disapproving the *in pari delicto* defense in certain situations include Waldron v. British Petroleum Co., 231 F.Supp. 72, 91–92 (S.D. N.Y.1964) and Mason City Tent & Awning Company v. Clapper, 144 F.Supp. 754, 769–770 (W.D.Mo.1956). With respect to Bales v. Kansas City Star Co., 336 F.2d 439, 444 (8th Cir. 1964), discussed at pp. 698–699, supra, these plaintiffs also seem to have "accepted the contract restriction only in business necessity" and not in an effort to help Midas violate the antitrust laws, so that the *in pari delicto* defense would be inapplicable to them under Bales. Cf. Englander Motors, Inc. v. Ford Motor Company, 267 F.2d 11 (6th Cir. 1959); Alles Corporation v. Senco Products, Inc., 329 F.2d 567 (6th Cir. 1964).

to them, but could have gone elsewhere.

\* \* \* \* \* \*

"The interests of the Government also frequently override agreements that private parties make. Here we have an antitrust policy expressed in Acts of Congress. Accordingly, a consignment [here a franchise agreement], no matter how lawful it might be as a matter of private contract law, must give way before the federal antitrust policy. \* \* \* Nor does § 1 of the Sherman Act tolerate agreements for resale price maintenance."

The public policy justifying the denial of an *in pari delicto* defense in a case of this sort was stated as follows with reference to the unclean hands defense raised in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219:

"If petitioner and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured." [2]

With respect to the majority's alternative basis discussed at p. 699 supra, this record shows that Midas and International held themselves out as separate and "divorced". Therefore, Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, does not permit defendants to claim that as a single business entity they were unable to conspire. Furthermore, under Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, and Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545, a conspiracy is not needed to support Count 1.

As to the muffler part of Count 3, defendants have not cited any authorities or legislative history to show that the difference in the Midas and International guarantees makes these physically identical mufflers [3] dissimilar in grade and quality within the meaning of Section 2(a) of the Robinson-Patman Act. Cf. Federal Trade Commission v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153, with the District Court's opinion herein (1966 CCH Trade Cases at p. 82,-710). Therefore, affirmance on this point is not justified.

Except as indicated, I concur in the opinion of the Court.

---

2. See also Budget Dress Corp. v. International Ladies' Garment Workers' Union, 25 F.R.D. 506, 508, 509 (S.D.N.Y.1959); Trebuhs Realty Co. v. News Syndicate Co., 107 F.Supp. 595, 599 (S.D.N.Y.1952).

3. A different gauge of steel was used in the Midas muffler after January 1, 1959, but plaintiffs have limited their claim to pre-1959 mufflers.